## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY M. POPPEL, on his own behalf and on behalf of all others similarly situated, | |
| Plaintiffs, | No. |
| v. | |
| THE ROCKEFELLER INSTITUTE, a.k.a. THE ROCKEFELLER UNIVERSITY, a.k.a. THE ROCKEFELLER UNIVERSITY HOSPITAL; THE ROCKEFELLER UNIVERSITY; THE ROCKEFELLER UNIVERSITY HOSPITAL; and THE ROCKEFELLER FOUNDATION, | JURY TRIAL DEMANDED |
| Defendants. | |

## <u>ORIGINAL COMPLAINT</u>

Jeffrey M. Poppel, on his own behalf and on behalf of all others similarly situated, files this Complaint against The Rockefeller Institute, a.k.a. The Rockefeller University, a.k.a. The Rockefeller University Hospital, The Rockefeller University, The Rockefeller University Hospital, and The Rockefeller Foundation (collectively "Rockefeller" or "Hospital") and alleges as follows:

## I.    INTRODUCTION

1.    This is a civil action to recover damages on behalf of Plaintiff and a

class of similarly situated individuals who have been harmed by sexual abuse, perpetrated over the span of forty years, by Dr. Reginald Archibald ("Archibald"), and most recently by the transmission and receipt of a highly offensive, and extreme and outrageous correspondence directed at them for no purpose other than to benefit the entity that for four decades employed their perpetrator.

2.     Beginning in the 1940s through the late 1980s, Archibald was employed as a pediatric endocrinologist at Rockefeller.

3.     By its own account, Defendant Rockefeller has been a preeminent research facility, with an international reputation for excellence since its opening in 1910.

4.     Over his career, Archibald had more than 9,000 patients, many of whom were boys who were small for their age, and who for various reasons were unable to grow to what medical professionals consider a "normal" size.

5.     Throughout his career, Archibald molested and sexually abused at least hundreds, but more likely thousands of patients. He did so using his office and examination rooms at Defendant Rockefeller's facilities. Archibald also took nude and pornographic photos of his victims and kept them at Rockefeller's facility. Upon information and belief, Rockefeller staff members were aware of the photographs and his conduct for many years, and remained silent regarding same.

6.    Archibald stole something innocent, and sensitive, and sacred from every child he abused.

7.    Defendant Rockefeller investigated and found credible allegations of sexual abuse by Archibald at the latest in 2004, when Archibald was still living.

8.    Archibald died in 2007.

9.    Recently, in anticipation of litigation following what it knew was the likely passage of the Child Victims Act, S2440, Defendant Rockefeller re-engaged a law firm to investigate and reach out to individuals who were likely abused by Archibald, and who were of course potential plaintiffs.

10.    As a part of its investigation and attempt to mitigate its liability, Defendant Rockefeller mailed a correspondence ("Letter") to at least 1,000 former patients of Archibald. The Letter indicated that Rockefeller believed the recipient may have been the victim of inappropriate conduct by Archibald and included contact information for a lawyer and law firm—although the Letter did not identify them as such, nor did the Letter inform the recipients what uses their information would be put to.

11.    Predictably, the Letter reopened wounds and re-traumatized Archibald's victims, causing severe emotional distress and invading their privacy.

## II.   JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over Mr. Poppel's individual claims pursuant to 28 U.S.C. § 1332(a) because complete diversity exists among the parties and the amount in controversy exceeds $75,000.

13.    This Court also has subject matter jurisdiction over Plaintiffs' class claims pursuant to 28 U.S.C. § 1332(d) because complete diversity exists among the parties and the amount in controversy exceeds $5,000,000.

14.    This Court has personal jurisdiction over Defendant Rockefeller because it is a citizen of the State of New York, and the acts that form the basis for this Complaint occurred, in substantial part, in the State of New York.

15.    Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because Defendant resides in this District and a substantial part of the acts or omissions that give rise to this action occurred in this District.

16.    Upon information and belief, less than one third of the members of the putative class reside in the State of New York.

## III.   PARTIES

17.    Plaintiff Jeffrey M. Poppel ("Mr. Poppel") is a citizen and resident of the State of Florida.

18.    Defendant The Rockefeller Institute is located at 1230 York Ave., New

York, New York 10065.

19.    Defendant The Rockefeller Institute is a domestic not-for-profit corporation formed under and governed by the laws of the State of New York.

20.    Defendant The Rockefeller University is located at 1230 York Ave., New York, New York 10065.

21.    Defendant The Rockefeller University is a domestic not-for-profit corporation formed under and governed by the laws of the State of New York.

22.    Defendant The Rockefeller University Hospital is located at 1230 York Ave., New York, New York 10065.

23.    Defendant The Rockefeller University Hospital is a division of The Rockefeller University. It operates under the charter of Defendant Rockefeller University.

24.    Defendant The Rockefeller Foundation is located at 420 Fifth Ave., New York, New York 10018.

25.    Defendant The Rockefeller Foundation is a domestic not-for-profit corporation formed under and governed by the laws of the State of New York.

26.    Rockefeller was founded in 1910, and it was originally called "The Rockefeller Institute Hospital." It was a part of the Rockefeller Institute for Medical Research, which was founded in 1901. From 1958 to 1965, the institution was called

"The Rockefeller Institute," and it has been known by its present name, the Rockefeller University Hospital, since 1965.

27.    Rockefeller is a world-renowned research institute funded by federal grant money, philanthropic donations from prominent donors, royalties from patents, and by borrowing money on the public market through the issuance of bonds.

28.    Rockefeller states on its website:

> Patients and volunteers who consent to participate in research studies (protocols) are treated without charge. Unlike most hospitals, the Rockefeller University Hospital does not routinely provide standard diagnostic and treatment services. Admission is selective: patients are chosen by Hospital physicians solely because they have an illness or condition being studied, or because they are healthy volunteers and are also needed for study. Thus, all research participants are volunteers, and as such are important partners in the research process. Without volunteers and patients, significant advances in biomedical knowledge could not otherwise be achieved.

## VI.    FACTUAL ALLEGATIONS

### A. General Allegations Pertaining to Archibald

29.    In 1940, Rockefeller hired Archibald as a visiting investigator and pediatric endocrinologist.

30.    Archibald would remain at Rockefeller, with limited exceptions, until 1982. He served as an assistant resident physician from 1941 through 1946. He returned to the Hospital as a senior physician and University professor in 1948, and

remained until 1980 as a hospital-based physician. He continued to hold medical staff privileges at the Hospital until at least 1982 and served as a senior physician emeritus until at least 1987.

31.    At all material times, Archibald worked for, was employed by, and acted as an agent, employee, and servant of Rockefeller under Rockefeller's direct supervision, management, agency, and control.

32.    In Defendant Rockefeller's words, "[]Archibald studied childhood growth and maturation, focusing on children of short stature."[1]

33.    Archibald was a preeminent pediatric endocrinologist. He was widely considered one of the best specialists in the northeast, if not the entire United States, for pediatric endocrinology.

34.    Defendant Rockefeller represented to the community and to patients that Archibald was safe, trustworthy, and of high moral and ethical repute. Implicitly and explicitly, Defendant Rockefeller represented that Archibald was not a sexual threat to his patients.

35.    Archibald's patients had no reason to suspect that Archibald was

---

[1] Statement regarding Dr. Reginald Archibald from the Rockefeller University Hospital (October 5, 2018), *available at*: https://www.rucares.org/assets/file/October%205%202018%20Statement%20regarding%20Dr.%20Reginald%20Archibald.pdf

anything other than a competent and ethical physician under the employ of Rockefeller University Hospital.

36.    Archibald treated approximately 9,000 patients during his career with Rockefeller.

37.    The children who sought treatment from Archibald were undersized and had trouble growing. They were especially vulnerable. They were too young to know the difference between a legitimate medical practice and molestation.

38.    For more than 40 years, Archibald sexually abused his patients.

39.    Archibald sexually abused both girls and boys.

40.    Archibald's victims were children. As minors, they were incapable of consenting to sexual contact.

41.    Archibald's victims also were unable to terminate the doctor–patient relationship they had with Defendants.

42.    Archibald would require his patients to remove all clothing during appointments.

43.    Archibald measured his male victims' penises, both flaccid and erect.

44.    Archibald would masturbate his victims or ask them to masturbate, sometimes to ejaculation. In some cases, he both asked his victims to masturbate and masturbate them.

45.    Archibald took nude and sexually explicit photographs of his patients, first with film, and later with a Polaroid camera.

46.    He would require his victims to stand fully nude against a wall and hold their palms out facing the camera.

47.    Archibald also took close-up photographs of his victims' genitals.

48.    Defendant Rockefeller is currently in possession of nude and pornographic photographs of Archibald's victims.

49.    The nude and pornographic photographs are not currently contained in the patient files of Archibald's victims.[2] If they were contained in patient files at one time, then Rockefeller had contemporaneous access to the photographs.

50.    In at least one case, Archibald had a child's parent sign a release to permit photography of the child "for the advancement of medical science."

51.    At least two articles published by Archibald contain pictures of naked boys in the stance described by his victims.

52.    Archibald's abuse took place in his office and the examination rooms at Rockefeller's facilities.

---

[2] Defendant Rockefeller has acknowledged that "[f]astidiously maintaining" the "vital data" of its patients "is the responsibility" of Rockefeller. In this regard, Defendant Rockefeller has boasted that it "has every medical record on every patient ever seen at the hospital, saved on microfiche, microfilm, or in original hard copy."

53.    Archibald used Defendant Rockefeller's equipment while abusing his victims.

54.    Upon information and belief, other Rockefeller staff members were aware of Archibald's sexual abuse at the time he was abusing children.

55.    Upon information and belief, Defendant Rockefeller was aware of the nude and pornographic photographs Archibald was taking of his victims while his victims were still patients of the Hospital.

56.    Archibald carried out of all of these acts under the guise of "providing medical" care at Rockefeller University Hospital.

57.    Archibald carried out these acts without fully explaining the "treatment" or obtaining informed consent from his patients.

58.    Rockefeller had the authority and the ability to prevent Archibald from sexually abusing pediatric patients, and from taking nude and pornographic photographs of pediatric patients, throughout Archibald's career at Rockefeller.

59.    Rockefeller failed to do so, and affirmatively ignored Archibald's abusive behavior, allowing the abuse to occur and to continue unabated.

60.    Upon information and belief, Rockefeller never suspended, warned, terminated, or otherwise disciplined Archibald for this heinous conduct.

61.    Reasonably supervising Archibald and investigating him regarding his

abusive conduct and the nude photos he took would have prevented further abuse.

62.    Upon information and belief, this failure was a part of a conspiratorial plan and arrangement by Rockefeller and Archibald to conceal Archibald's wrongful acts, to avoid and inhibit detection, to block public disclosure, to avoid scandal and negative publicity, to avoid the disclosure of Rockefeller's tolerance of child sexual molestation and abuse, to preserve a false sense of propriety, and to avoid investigation and action by public authority including law enforcement.

63.    Such actions were motivated by a desire to protect the reputation and monetary support of Rockefeller, while fostering an environment where such abuse could continue to occur.

**B. Rockefeller's Investigations of Archibald's Conduct**

64.    On October 5, 2018, Rockefeller issued a statement indicating that it had received a report from a former patient of Archibald's that "related to the propriety of [] Archibald's conduct during physical examinations."

65.    Rockefeller retained a law firm, Debevoise & Plimpton LLP ("Debevoise") to investigate the allegations. "Following its review of then-available information, including from interviews with former patients, faculty, administrators, and staff, and two prior reports made in the 1990s that were located, Debevoise found certain allegations credible and determined that it was likely that some of []

Archibald's behavior towards [the reporting patient in 2004] was inappropriate."

66.    Debevoise was, at all times during the 2004 investigation, an agent of Defendant Rockefeller. It acted for Defendant Rockefeller's benefit and was subject to Defendant Rockefeller's control.

67.    Notably, Debevoise's investigation turned up two prior reports made during the 1990s. Rockefeller does not claim to have taken any action based on those prior reports.

68.    Upon information and belief, the "faculty, administrators, and staff" Debevoise interviewed were former colleagues of Archibald who had knowledge of his inappropriate conduct at or around the times it was occurring.

69.    In its October 5, 2018 Statement, Rockefeller also indicated that it had added a "policy relating to the further protection of pediatric patients" to "the Hospital's then-existing safeguards and processes designed to protect patients."

70.    However, Rockefeller did not explain what the newly added 2004 policy was, or what the previously existing "safeguards and processes designed to protect patients" were.

71.    After Debevoise's 2004 investigation, Defendant Rockefeller believed that allegations of Archibald's inappropriate conduct were credible.

72.    After Debevoise's 2004 investigation, Defendant Rockefeller had

reason to believe that Archibald's conduct was widespread and consistent across his victims.

73.    In its October 5, 2018 Statement, Defendant Rockefeller notes that in 2004 it "notified the Federal Office of Human Research Protections, the New York State Office of Professional Medical Conduct, and the Manhattan District Attorney."

74.    In 2004, however, Defendant Rockefeller did not notify potential victims so that they could offer additional, corroborating information to the District Attorney and testify against Archibald as part of a criminal prosecution.

75.    Upon information and belief, Defendant Rockefeller did not notify the United States Attorney's Office for the Southern District of New York.

76.    If it had notified the United States Attorney's Office, and the United States Attorney's Office had prosecuted (a then living) Archibald for child pornography, Archibald's victims could have sought restitution as a part of the prosecution. *See* 18 U.S.C. § 2259.

77.    Another former patient came forward in early 2018 and made a report that was similar to the report made in 2004.

78.    At that time, Rockefeller again engaged Debevoise to investigate.

79.    Debevoise was, at all times during the 2018 investigation, an agent of Defendant Rockefeller—and it remains an agent of Defendant Rockefeller currently.

It acted—and continues to act—for Defendant Rockefeller's benefit and was subject to Defendant Rockefeller's control.

80.    "[S]everal former patients . . . came forward" as a part of Debevoise's 2018 investigation.

81.    As it had in 2004, Debevoise concluded that the reports were credible and that Archibald's conduct was "inappropriate."

82.    As the 2004 investigation did, Debevoise's 2018 investigation gave Defendant Rockefeller significant reason to believe that Archibald's conduct was widespread throughout his career, consistent with respect to his victims, and severely traumatic to his victims.

**C. Rockefeller's Letter to Former Patients of Archibald**

83.    In the fall of 2018, as a part of Debevoise's investigation into allegations concerning Archibald's conduct, Defendant Rockefeller sent the Letter to more than 1,000 former patients of Archibald.

84.    The Letter states:

Our records indicate that, some decades ago, you may have been a patient at The Rockefeller University Hospital and seen by [] Reginald Archibald, who was at the Hospital from 1948–1982 and passed away in 2007. If we have contacted you in error, please disregard this letter.

Based on reports from several former patients regarding Dr. Archibald's interactions with them, we are reaching out to as many of his patients as we can locate. We have hired Helen Cantwell, of Debevoise & Plimpton LLP, to assist us with this outreach. If you have

14

information you would like to share regarding your interactions with []
Archibald, please contact Helen at: (212) 909-6312 or
hcantwell@debevoise.com.

Thank you for your consideration.

85.    Helen Cantwell is a lawyer—and a litigation partner—at Debevoise,
which is a prominent international law firm. The Letter does not identify Ms.
Cantwell as a lawyer, nor does it identify Debevoise as a law firm.

86.    The Letter does not indicate what use Rockefeller will make of the
"information" that the Letter recipients might decide to "share regarding [their]
interactions with [] Archibald."

87.    The Letter does not promise to preserve the confidentiality of any
information former patients provide, nor does it indicate whether any information
they provide will be segregated from future litigation materials, whether personal
identifying information will be removed from their communications, or whether
their communications may be used against them in future litigation.

88.    Anyone who received the Letter, and as a result took steps to identify
Helen Cantwell or Debevoise, could have easily seen that she was an attorney and it
was a law firm, and would have likely believed that an attorney–client relationship
existed between the recipient and Ms. Cantwell or her firm, despite the fact that no
such relationship existed.

89.    Communications with possible victims of sexual abuse in other

high-profile investigations have taken pains to preserve witness and victim confidentiality. Similarly, other investigations have carefully identified investigators as attorneys when they are attorneys.[3] The purpose of such disclosures is to prevent re-traumatization of victims. Other communications regarding mass sexual abuse have allowed victims to come forward on their own following public, non-targeted disclosures.

90.    At the time Rockefeller mailed the Letter to former patients of Archibald, New York's statute of limitations barred any claims against the Hospital.

91.    Upon information and belief, Rockefeller was aware that New York's statute of limitations barred any claims for sexual abuse against the Hospital.

92.    Upon information and belief, Rockefeller was aware that a substantial portion of the public is aware of the existence of various statute of limitations and that a substantial portion of the public—including Archibald's victims—would believe that abuse that occurred decades ago would be time barred.

93.    At the time Rockefeller mailed its Letter, it knew from publicly available news reports that the New York Legislature would likely take up for consideration, and likely pass, the Child Victims Act during its 2019 legislative

---

[3] *See* The Ohio State University, Office of Compliance and Integrity, *Strauss Investigation*, https://compliance.osu.edu/strauss-investigation.html.

session.

94.     Previous versions of the Child Victims Act from the 2018 session provided for a one-year window in which any plaintiff could file a lawsuit for claims of sexual abuse, irrespective of any other statute of limitations or whether the claims were previously barred. Rockefeller was aware that it was likely that any version of the Child Victims Act ultimately passed would include such a provision. In addition, even if the look-back provision was stripped from the statute, Defendant Rockefeller was aware that claims for many individuals under a certain age would remain under the new legislation.

95.     Upon information and belief, at least one purpose of Rockefeller's decision to send the Letter to more than a 1,000 former patients was to gather information about potential plaintiffs in advance of litigation.

96.     Because of its previous investigations, Rockefeller was aware that there was a substantial likelihood that it was sending the Letter to survivors of child sexual abuse.

97.     Upon information and belief, Rockefeller knew that it was substantially likely that its Letter would cause a significant number of Archibald's former patients to suffer immediate, long-lasting, and severe emotional distress.

98.     Despite its awareness that it was sending its Letter to survivors of child

sexual abuse and that its Letter would likely cause a significant number of the Letter's recipients to suffer severe emotional distress, Rockefeller sent the Letter anyway.

99.    Rockefeller's Letter did not comply with national best practices for investigating pervasive sexual abuse, especially pervasive childhood sexual abuse.

100.    Many victims of Archibald's sexual abuse were reminded of the abuse they suffered, and therefore re-traumatized by Rockefeller's Letter.

101.    Many of the former patients who received the Letter learned of the possibility of other victims, for the first time, in the Letter.

102.    Additionally, Rockefeller did not "obtain an authorization for any use or disclosure of protected health information for marketing," and the Letter was not "a face-to-face communication or a promotional gift of nominal value." *See* 45 C.F.R. § 164.508(3)(i).

103.    The Letter was not sent pursuant to any current medical evaluation, diagnosis or treatment sought by its recipients.

104.    "Marketing" under the HIPAA Privacy Rule is defined as the making of "a communication about a product or service that encourages recipients of the communication to purchase or use the product or service." 45 C.F.R. § 164.501.

105.    The Letter was a communication about a service, namely Debevoise's

18

investigation, which encouraged the Letter's recipients to use the firm's services.

**D. Individual Plaintiff's Allegations**

106.    Mr. Poppel was born on July 30, 1964.

107.    Mr. Poppel was born with congenital deformities of the upper extremities.

108.    Mr. Poppel was born with short arms, club forearms, small hands, four fingers on each hand, no kneecaps, and coloboma of the eyes.

109.    As a child, Mr. Poppel was extremely short for his age.

110.    Mr. Poppel recalls being sorted and lined up according to height when he was in elementary school.

111.    Mr. Poppel recalls being bullied by other children because of his size.

112.    As a result, Mr. Poppel was extremely concerned about his size as a child.

113.    Mr. Poppel grew up in northern New Jersey.

114.    As a result of his birth injuries, required medical care as a child.

115.    Part of his medical care was, in addition to routine medical care elsewhere, specialized medical care related to his birth injuries.

116.    Mr. Poppel's mother was referred to Rockefeller for specialized treatment for his small stature and birth deformities.

117.   Mr. Poppel was a patient at Rockefeller approximately from 1975 to 1980.

118.   On or about October 15, 1975, Mr. Poppel's father signed two consent forms. One stated: "I hereby consent that any routine treatment and diagnostic procedure, which may be deemed necessary, may be performed upon my son, Jeffrey M. Poppel." The other stated: "I hereby give permission for photographs of my child Jeffrey M. Poppel to be taken, only for medical and professional purposes."

119.   Mr. Poppel had several appointments with Archibald at Rockefeller University Hospital. Several involved traumatic sexual abuse.

120.   Mr. Poppel's mother drove him from New Jersey to Manhattan for the first appointment.

121.   Mr. Poppel waited with his mother in the waiting room for the first appointment to begin.

122.   Archibald came into the waiting room to take Mr. Poppel back into the examination room.

123.   Mr. Poppel's mother told Archibald she wanted to accompany her son into the examination room for the appointment.

124.   Archibald refused and told her there was no need for her to be there.

125.   He told her that a nurse would be present in the examination room.

126.    Hearing this, Mr. Poppel's mother acquiesced and allowed Archibald to take Mr. Poppel away and into the examination room.

127.    Mr. Poppel also relied on Archibald's assertion that since a nurse would be in the examination room, his mother, with whom he was very close, did not need to come into the examination room.

128.    Archibald took Mr. Poppel, alone and without his mother, to the examination room, which was dimly lit, and locked the door behind them as they entered.

129.    There was no nurse there. No nurse—or anyone else—was present during Mr. Poppel's "examination." Mr. Poppel was alone with Archibald during the examination.

130.    A physician's table was against one wall, and a cold, steel-framed desk was against the other.

131.    Upon entering the room, Archibald directed Mr. Poppel to remove all of his clothing. Mr. Poppel complied.

132.    Archibald directed Mr. Poppel to stand against the wall. Mr. Poppel complied.

133.    Archibald took nude photographs of Mr. Poppel standing against the wall.

134.   Archibald then took Mr. Poppel to the physician's examination table and put him on it.

135.   Archibald told Mr. Poppel that he needed to measure Mr. Poppel's penis in both flaccid and erect state. He told Mr. Poppel that he needed to measure his penis so he could predict more accurately his future height and to determine what medical treatment would be required to augment it.

136.   Rockefeller's medical records for Mr. Poppel confirm that Archibald took measurements of Mr. Poppel's penis.

137.   Archibald then directed Mr. Poppel to masturbate. He told Mr. Poppel to "masturbate," but Mr. Poppel—who was approximately eleven years old at the time—did not immediately understand. Archibald told Mr. Poppel to "touch yourself the way you do at home or may do at home."

138.   Archibald went on: "I need to determine your future height. To do that, I need a semen sample."

139.   All of this sounded just scientific enough to be plausible to an approximately eleven-year-old boy.

140.   Archibald falsely represented to Plaintiff that it was medically necessary, and integral to effective treatment, for Plaintiff to submit to the sexual abuse perpetrated by Archibald, when, in reality, the sole purpose of the abuse was

Archibald's own sexual gratification.

141.   Mr. Poppel attempted to masturbate. However, his arms were not long enough to reach his penis, and he had to curl up into the fetal position in order to reach his penis. It was humiliating.

142.   Archibald watched and took a photograph of Mr. Poppel attempting to masturbate.

143.   Mr. Poppel was terrified. He had never masturbated before, and he could not fully reach his penis with his short arms; and so he could only achieve a partial erection.

144.   While Mr. Poppel continued to attempt to masturbate, Archibald went and sat down at the cold, steel-framed desk, and waved his finger at Mr. Poppel, gesturing for him to come closer. Mr. Poppel complied.

145.   Then Archibald picked up Mr. Poppel, who was still naked, and placed him on his left leg.

146.   Knowing that Mr. Poppel was trusting and vulnerable—and only eleven years old—Archibald used his position of authority to require Mr. Poppel to fully disrobe for no reasonable medical purpose, engage in touching, fondling, and groping of Mr. Poppel's genitals, engage in nonconsensual sexual touching and fondling of genital region for the purpose of sexual arousal, sexual gratification,

and/or sexual abuse.

147.    Mr. Poppel was not able to provide Archibald with the semen sample Archibald falsely represented that he needed to predict Mr. Poppel's future height.

148.    Archibald carried out these acts without fully explaining the "treatment" or obtaining informed consent of Mr. Poppel's parents and other members of the Class.

149.    All of Archibald's acts were conducted under the guise of providing medical care Rockefeller.

150.    The failure to give proper notice or to obtain consent for the purported "treatment" from Class Plaintiffs negated their objection to reject the "treatment."

151.    Archibald used his position of trust and confidence in an abusive manner causing Mr. Poppel to suffer a variety of injuries including but not limited to shock, humiliation, emotional distress and related physical manifestations thereof, embarrassment, loss of self-esteem, disgrace, loss of enjoyment of life and negative impacts on his life.

152.    Mr. Poppel was terrified, humiliated, and confused.

153.    He told Archibald that he wanted to leave the room and be with his mother.

154.    Archibald told Mr. Poppel that he could not leave and continued engage

in appropriate touching.

155.   This was Mr. Poppel's first sexual experience.

156.   Mr. Poppel dressed and left the room.

157.   Mr. Poppel's fear, humiliation, and confusion continued after he left the examination room. He recalls feeling like he was going to die. He wanted to tell his mother what had happened, but he could not.

158.   In addition to these feelings, Mr. Poppel recalls thinking, as his mother drove him back to New Jersey, that he had failed and that his short stature could not be solved or remedied because he could not complete the task Archibald had given him. At the same time, however, Mr. Poppel instinctively knew that something very wrong had happened.

159.   Archibald's sexual abuse of Mr. Poppel robbed him of his childhood innocence.

160.   Following his sexual abuse by Archibald, Mr. Poppel had trouble concentrating in school and participating in normal activities.

161.   Mr. Poppel also suffered from diarrhea and irritable bowel syndrome following the sexual abuse, he also had trouble sleeping, and he experienced severe headaches and was in constant fear.

162.   Mr. Poppel was deathly afraid of returning to Rockefeller University

Hospital.

163.  As a result of the sexual abuse he suffered, Mr. Poppel had difficulty dating and forming relationships, especially intimate ones.

164.  The fear and difficulty forming relationships Mr. Poppel has suffered from, as a result of his sexual abuse, has also made him emotionally unable to have children of his own.

165.  All of these feelings and challenges remained, and he continued to struggle with them, for many years. To this day, he struggles with lack of trust.

166.  In the years after his encounter with Archibald, Mr. Poppel sought to move on with his life, moving to Florida and becoming a lawyer.

167.  Nonetheless, Mr. Poppel never forgot about the sexual abuse, and he is reminded of the sexual abuse frequently, including whenever he sees the Rockefeller name.

168.  To this day, Mr. Poppel is extremely nervous and anxious around doctors. His heart rate increases and his blood pressure elevates around doctors, and he cannot see doctors without taking anxiety medication.

169.  Mr. Poppel still has nightmares in which he relives the encounter with Archibald, except that further events occur, and Archibald wakes up shortly before Archibald rapes him.

170.   As a direct result of the sexual abuse, Mr. Poppel has also struggled throughout his life with anxiety, depression, and, at times, self-medicating behavior.

171.   All of these symptoms are consistent with post-traumatic stress disorder.

172.   Mr. Poppel also worries about the photos Archibald took of him. He does not know their current whereabouts. He is haunted by the thought that other people have seen them or that they will appear on the internet.

173.   Mr. Poppel worries that his photo is in one of the journal articles Archibald published.

174.   Upon information and belief, despite complaints to Rockefeller representatives, the concerns and allegations went unaddressed in violation of reporting policies and procedures and in a manner that was reckless, deliberately indifferent, and grossly negligent.

175.   On Saturday evening, October 6, 2018, Mr. Poppel received the Letter from Rockefeller.

176.   Plaintiff saw Rockefeller identified in the return address and knew immediately the communication pertained to Archibald's abuse.

177.   By this time, Mr. Poppel had had no contact with Rockefeller University Hospital since about 1980.

178.    Mr. Poppel was immediately shocked by the Letter. His heart dropped when he saw Rockefeller in the return address and he was filled with anxiety when he read the Letter's contents confirming that it was about Archibald.

179.    The Letter immediately brought Archibald's sexual abuse of Mr. Poppel to the forefront of his mind, and it forced Mr. Poppel to relive the encounter over, and over again.

180.    The Letter gave the immediate impression that Archibald may have sexually abused a significant number of children. Mr. Poppel had no idea that Archibald had molested other children before reading the Letter.

181.    It was infuriating for Mr. Poppel to realize that he had been part of a factory of abuse.

182.    As a result of receiving and reading Defendant Rockefeller's letter, Mr. Poppel was forced to recall his sexual abuse by Archibald, and he suffered and continues to suffer severe emotional distress.

183.    Rockefeller's sending of the Letter robbed Mr. Poppel of the right to process the issues stemming from Archibald's sexual abuse of him on his own timetable. Mr. Poppel has been infuriated by this fact.

184.    Mr. Poppel was unable to sleep at all on the night of Saturday, October 6, 2018. He was unable to sleep the following night, Sunday, October 7, 2018.

185.    For weeks afterward, Mr. Poppel was unable to sleep through the night completely and even today continues to struggle with sleep.

186.    Mr. Poppel's inability to sleep completely through the night began to affect his work.

187.    Prior to receiving the Letter, Mr. Poppel had never told anyone that he was sexually abused by Archibald.

188.    Eventually, Mr. Poppel's stress and inability to sleep became apparent to his family and his girlfriend, whom he considers his life partner and with whom he has lived together for more than a decade.

189.    Mr. Poppel told his partner. She was horrified.

190.    Mr. Poppel told his mother, who was horrified.

191.    Mr. Poppel's mother told him she blamed herself, because she recalled objecting to Archibald's not allowing her to be in the examination room with him. In addition, she recalled his insistence that a nurse would be in the room at all times. Moreover, she recalled acquiescing, and watching her son disappear behind the door of the examination room.

192.    Mr. Poppel told his father, who was horrified.

193.    Mr. Poppel told his stepdaughter, who was horrified.

194.    Mr. Poppel also emailed Helen Cantwell at the contact information

provided in Rockefeller's Letter.

195. He asked her several questions, including "what exactly will [Rockefeller] do with the information I can provide about [Archibald] and what he did to me, what he made me do (and robbing my youthful innocence in the process)?" and "what's the reason [Rockefeller] has sought me out after all these years?" Mr. Poppel also expressed that he never expected the traumatic experience he suffered as a child to come back so acutely, nearly half a century later.

196. Ms. Cantwell did not respond to these questions.

197. Nor did Ms. Cantwell provide any information as to whether Rockefeller would segregate and remove identification from any information Mr. Poppel provided to her.

198. This gave Mr. Poppel the immediate impression that Rockefeller's effort to reach out to him and other former patients of Archibald was in reality an effort to gather information about potential future plaintiffs in litigation against the Hospital.

199. Mr. Poppel also inquired how he could obtain his medical records from Rockefeller.

200. Ms. Cantwell did not respond to that request either.

201. Mr. Poppel also demanded that any records pertaining to him be

preserved.

202.   Ms. Cantwell did not respond to this demand either.

## VI.   CLASS ALLEGATIONS

203.   Plaintiff seeks relief under Federal Rule of Procedure 23(b)(3) on behalf of a class of similarly situated individuals, who were patients of, and abused by Archibald, and who received a Letter from Defendant Rockefeller.

204.   Plaintiff is representative of a class of similarly situated individuals that includes persons who were sexually abused by Archibald at the Hospital, and subsequently received a Letter from Rockefeller in the fall of 2018 seeking information about Archibald's abuse.

205.   Plaintiff's claims individually, and the Class's claims in the aggregate, exceed $5,000,000 exclusive of interests and costs.

206.   The members of the Class are so numerous that joinder of all members is impractical.

207.   Defendant Rockefeller sent Letters to more than 1,000 former patients of Archibald.

208.   Individual litigation by each member of the Class would be impractical and place an undue burden on the judicial system.

209.   The prosecution of individual actions by the members of the Class

would create a risk of inconsistent adjudications and legal precedent.

210.    Plaintiff's and Class members' claims raise common questions of law and fact, including but not limited to the following:

   a.  Whether Defendant Rockefeller had a duty to avoid causing the recipients of its Letter emotional distress;

   b.  Whether there was an especial likelihood that the Letter would cause a significant portion of the recipients to suffer genuine and serious mental anguish and emotional distress;

   c.  Whether Rockefeller had a duty to refrain from sending the Letter to survivors of child sexual abuse at all;

   d.  Whether Rockefeller's conduct in sending the Letter to victims of sexual abuse who, at the time they received the Letter, believed they had no legal recourse for the sexual abuse they endured, was extreme and outrageous;

   e.  Whether Rockefeller acted negligently;

   f.  Whether Rockefeller was reckless and disregarded a substantial probability that the Letter would cause severe emotional distress by reopening the wounds of the victims of Archibald's sexual abuse;

   g.  Whether Defendant Rockefeller acted unreasonably by sending its

Letter to more than 1,000 former patients of the Hospital who it believed to be survivors of child sexual abuse and who, at that time, had no legal recourse for the sexual abuse they suffered; and

h.  Whether Rockefeller's Letter intruded upon its former patient's seclusion in a way that was highly offensive.

211.  The common issues of law and fact predominate over potential individual issues in the litigation.

212.  To the extent that there are individual issues regarding emotional distress and other damages with respect to Rockefeller's Letter to Archibald's victims, the common issues of law and fact identified above could still be treated as a class pursuant to Rule 23(c)(4).

213.  The claims of Plaintiff are typical of the Class.

214.  Plaintiff will fairly and adequately represent the interests of the Class because his interests align with the Class and do not conflict with the interests of other Class members.

215.  The attorneys representing Plaintiff are experienced in representing children who have suffered lifelong injuries, as well as representing plaintiffs in class actions and mass tort litigations.

216.  Prosecuting claims as a class action against Rockefeller with respect to

its Letter is superior to prosecuting them individually.

## VI.    CAUSES OF ACTION

### COUNT I (CLASS CLAIM)[4]:
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### AGAINST DEFENDANT ROCKEFELLER

217.    Plaintiff re-alleges and incorporates by reference the allegations

contained in all prior paragraphs as if fully stated in this Count.

218.    Defendant Rockefeller's conduct in sending the Letter to victims of

sexual abuse who, at the time they received the Letter, believed they had no legal

recourse for the sexual abuse they endured, was extreme and outrageous.

219.    Defendant Rockefeller was reckless and disregarded a substantial

probability that the Letter would cause severe emotional distress by reopening the

wounds of the victims of Archibald's sexual abuse.

220.    Defendant Rockefeller's conduct in sending the Letter in fact caused,

––––––––––––––––––––

[4] Plaintiff is currently 54 years of age and believes that the unambiguous language of section 2 of the Child Victims Act permits him to bring individualized claims, immediately. However, Plaintiff acknowledges that Section 3 of the Child Victims Act "revive[s]" claims that were "barred as of the effective date of this section." While Plaintiff does not expect Defendants to seek dismissal of any claims made timely by virtue of the Child Victims Act, he has chosen to wait six months from the date on which the Child Victims Act is signed into law to bring individualized claims against the Estate of Reginald Archibald and Rockefeller, by way of amendment, for: 1. Sexual Abuse; 2. Assault; 3. Battery; 4. Fraud; 5. False Imprisonment; 6. Medical Malpractice; 7. Negligent Hiring, Supervision and Retention; 8. Vicarious Liability; 9. Gross Negligence; and 10. Punitive Damages.

and was the proximate cause of, severe emotional distress, trauma, and mental anguish.

221.   Plaintiff suffered severe emotional distress when he read Defendant Rockefeller's Letter.

222.   Defendant Rockefeller's Letter forced Plaintiff to relive the sexual abuse he suffered at the hands of Archibald.

223.   Plaintiff could not sleep well for weeks after receiving the Letter. Plaintiff also suffered from irritable bowel syndrome and diarrhea.

224.   As a direct and proximate result of the above-described conduct, Plaintiff has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, permanent disability, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

225.   Plaintiff and all similarly situated individuals are entitled to monetary relief, in the form of compensatory damages, to remedy the severe emotional

distress suffered because of Defendant Rockefeller's outrageous conduct.

226.   The conduct of Defendant Rockefeller was both reckless and outrageous, entitling Plaintiff to an award of punitive damages.

## COUNT II (CLASS CLAIM):
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## AGAINST DEFENDANT ROCKEFELLER

227.   Plaintiff re-alleges and incorporates by reference the allegations contained in all prior paragraphs as if fully stated in this Count.

228.   Rockefeller University had a duty to avoid causing the recipients of its Letter to suffer emotional distress and to avoid re-traumatizing victims of child sexual abuse by forcing them to relive their abuse when reading the Letter.

229.   The recipients of Defendant Rockefeller's Letter were former patients of the Hospital, whom it had reason to believe were former patients and possible victims of Archibald.

230.   It was thus apparent that there was an especial likelihood that the Letter would cause a significant portion of the recipients to suffer genuine and serious mental anguish and emotional distress.

231.   Additionally, Defendant Rockefeller did not obtain an authorization from former patients of Archibald for any use or disclosure of protected health information for marketing, and had a duty not to contact them for marketing purpose

without obtaining authorization.

232.   Rockefeller acted unreasonably and breached its duty by sending the Letter.

233.   Receipt of the Letter in fact caused and was the proximate cause of severe emotional distress, trauma, and mental anguish.

234.   Because of the emotional distress, Plaintiff suffered physical injuries that manifested in the form of an inability to sleep, irritable bowel syndrome, and diarrhea.

235.   As a direct and proximate result of the above-described conduct, Plaintiff has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, permanent disability, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

236.   Plaintiff and all similarly situated individuals who received the Letter are entitled to monetary relief, in the form of compensatory damages, to remedy the

severe emotional distress they suffered because of Defendant Rockefeller's outrageous conduct.

237.   The conduct of Defendant Rockefeller was both reckless and outrageous, entitling Plaintiff to an award of punitive damages.

**COUNT III (CLASS CLAIM):**
**INTRUSION UPON SECLUSION**
**AGAINST DEFENDANT ROCKEFELLER**

238.   Plaintiff re-alleges and incorporates by reference the allegations contained in all prior paragraphs as if fully stated in this Count.

239.   Defendant Rockefeller intentionally sent a Letter to Plaintiff.

240.   The Letter was received in Plaintiff's private quarters.

241.   Through its Letter, Rockefeller intruded upon the solitude, seclusion, and private affairs and concerns of Plaintiff.

242.   When it sent the Letter to Plaintiff, Defendant Rockefeller knew there was substantial likelihood that Plaintiff had been sexually abused by Archibald, and that the Letter could re-traumatize Plaintiff, causing severe emotional distress.

243.   Accordingly, Defendant Rockefeller University Hospital's intrusion by sending the Letter to Plaintiff is highly offensive.

244.   As a direct and proximate result of the above-described conduct, Plaintiff has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, permanent disability, physical manifestations of emotional

distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

245.   Plaintiff and all similarly situated individuals who received the Letter are entitled to monetary relief, in the form of compensatory damages, to remedy the severe emotional distress they suffered because of Defendant's outrageous conduct.

246.   The conduct of Defendant Rockefeller was both reckless and outrageous, entitling Plaintiff to an award of punitive damages.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff requests that judgment be entered against Defendants, ordering:

a.  Defendants be enjoined from further violations of Plaintiffs' rights;

b.  Certification of a Class under Federal Rule of Civil Procedure 23(b)(3) of all persons who were sexually abused by Archibald and then received the Letter from Rockefeller;

c.  Plaintiffs are awarded compensatory, punitive, and exemplary damages for past and future pain and suffering and past and future emotional distress and mental anguish;

d.  Defendants pay for the costs of future counseling, therapy, and medical treatment related to the injuries described above;

e.  Plaintiffs are awarded pre-judgment and post-judgment interest;

f.  Defendants pay Plaintiff's reasonable costs and attorneys' fees; and

g.  All other relief the court deems necessary and equitable.

## JURY DEMAND

A trial by jury is hereby demanded.

Dated: February 13, 2019.

**LEVY KONIGSBERG, LLP**

By:  /S/ COREY M. STERN
Corey M. Stern
*cstern@levylaw.com*
Renner K. Walker
*rwalker@levylaw.com*
800 Third Ave., 11th Floor
New York, NY 10022
Phone:   (212) 605-6200
Fax:   (212) 605-6290

*Attorneys for the Plaintiff and Putative Class*

40