# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

JEFFREY M. POPPEL, on his own behalf and
on behalf of all others similarly situated,

                Plaintiff,

      v.

THE ESTATE OF DR. REGINALD
ARCHIBALD; and THE ROCKEFELLER
INSTITUTE, a.k.a. THE ROCKEFELLER
UNIVERSITY, a.k.a. THE ROCKEFELLER
UNIVERSITY HOSPITAL,

                Defendants.

No. 1:19-cv-01403

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO THE ROCKEFELLER UNIVERSITY'S MOTION TO DISMISS

**LEVY KONIGSBERG LLP**
Corey M. Stern
Renner K. Walker
800 Third Ave., 11th Fl.
New York, NY 10022
(212) 605-6200
Cstern@levylaw.com
Rwalker@levylaw.com

*Counsel for the Plaintiff, Jeffrey M. Poppel,
on his own behalf and on behalf of all others
similarly situated*

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ...........................................................................................................1

LEGAL STANDARD......................................................................................................3

ARGUMENT ..................................................................................................................4

I.   ROCKEFELLER IS VICARIOUSLY LIABLE FOR ARCHIBALD'S SEXUAL ABUSE....4

     A.   Archibald's sexual abuse was in the scope of his employment ...........................................4

     B.   Even if Archibald's sexual abuse was outside the scope of employment,
          century-old New York case law makes employers liable for sexual abuse
          committed in unusual situations........................................................................10

II.  PLAINTIFF'S INDIVIDUAL CLAIMS ARE ALL REVIVED BY NEW YORK'S CHILD
     VICTIMS ACT .........................................................................................................11

III. ROCKEFELLER DID NOT SIGNAL ITS INTENT TO CHALLENGE PLAINTIFF'S
     NEGLIGENT HIRING CLAIM IN ITS PRE-MOTION LETTER .....................................12

IV.  PLAINTIFF HAS ADEQUATELY PLED CLAIMS FOR EMOTIONAL DISTRESS AND
     INTRUSION UPON SECLUSION BASED UPON ROCKEFELLER'S OUTRAGEOUS
     INVESTIGATORY LETTER ......................................................................................13

     A.   Florida law applies to Plaintiff's letter claims ................................................................13

     B.   Plaintiff has adequately pled an intrusion upon seclusion claim .......................................15

     C.   Plaintiff has adequately pled an intentional infliction of emotional distress claim ...........16

          1.   Rockefeller's investigatory letter was extreme and outrageous ...................................16

          2.   Rockefeller sent its investigatory letter to a group of people it believed contain
               survivors of child sexual abuse in disregard of a substantial probability that the letter
               would cause severe emotional distress .......................................................................19

     D.   Plaintiff has adequately pled a negligent infliction of emotional distress claim ...............22

CONCLUSION................................................................................................................25

**TABLE OF AUTHORITIES**

**Cases**

*Agency for Health Care Admin. v. Associated Indus. of Fla.*,
  678 So.2d 1239 (Fla.1996)................................................................................15

*AHW Inv. P'ship, MFS, Inc. v. Citigroup Inc.*, 661 Fed. App'x 2 (2d Cir. 2016) ........................14

*Allstate Ins. Co. v. Stolarz*, 81 N.Y.2d 219 (1993) ........................................................13

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) ....................................18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................3, 17

*Babcock v. Jackson*, 12 N.Y.2d 473 (1963)....................................................................14

*Baker v. Dorfman*, 239 F.3d 415 (2d Cir. 2000)...........................................................23, 25

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................3, 17

*Bigio v. Coca-Cola Co.*, 675 F.3d 163 (2d Cir. 2012)........................................................14

*Brown v. N.Y.C. Health & Hosps. Corp.*, 225 A.D.2d 36 (2d Dep't 1996)......................................23

*Cason v. Baskin*, 155 Fla. 198 (1944)........................................................................15

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ..................................................4

*Chase Group Alliance LLC v. City of New York Dep't of Fin.*,
  620 F.3d 146 (2d Cir. 2010)................................................................................3

*Cooney v. Osgood Mach. Inc.*, 81 N.Y.2d 66 (1993) .......................................................13, 14

*Cooper v. Parsky*, 140 F.3d 433 (2d Cir. 1998)...............................................................4

*Cornell v. State*, 46 N.Y.2d 1032 (1979) ...................................................................10

*Davis v. N.Y.C. Hous. Auth.*, 379 F. Supp. 3d 237 (S.D.N.Y. 2019)...........................................3

*De Wald v. Seidenberg*, 297 N.Y. 335 (1948) .................................................................8

*Devore v. Pfizer Inc.*, 58 A.D.3d 138 (1st Dep't 2008) .....................................................13

*DiBella v. Hopkins*, 403 F.3d 102 (2d Cir. 2005) ...........................................................9

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104 (2d Cir. 2010)..............................................3, 4, 17

*Elson v. Defren*, 283 A.D.2d 109 (1st Dep't 2001) ............................................................................13

*Epiphany Cmty. Nursery Sch. v. Levey*, 171 A.D.3d 1 (1st Dep't 2019).......................................11

*Faber v. Metro. Life Ins. Co.*, 648 F.3d 98 (2d Cir. 2011) ................................................................3

*Ferrara v. Galluchio,* 5 N.Y.2d 16 (1958) ........................................................................................23

*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016) ..........................................................18

*Gibbons v. Malone*, 703 F.3d. 595 (2d Cir. 2013) ..............................................................................3

*Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150 (2d Cir. 2006) .............................18

*Haywin Textile Prods., Inc. v. Int'l Fin. Inv.*, 137 F. Supp. 2d 431 (S.D.N.Y. 2001) .................15

*Hirst v. St. Paul Fire & Marine Ins. Co.*, 683 P.2d 440 (Idaho Ct. App. 1984)............................5

*Howard v. Sears, Roebuck & Co.*,
    2 Misc. 3d 1004(A), 784 N.Y.S.2d 920 (Sup. Ct. Kings Cty. 2004) ...............................25

*Howell v. New York Post Co.*, 81 N.Y.2d 115 (1993) ...............................................................15, 16

*In re McGrath*, 7 B.R. 496 (S.D.N.Y. 1980) ....................................................................................19

*In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d 348 (S.D.N.Y. 2005) ..........................................9

*In re Thelen LLP*, 736 F.3d 213 (2d Cir. 2013) .................................................................................4

*Jiles v. Rochester Genesee Reg'l Transp. Auth.*, 317 F. Supp. 3d 695 (W.D.N.Y. 2018)............15

*Johnson v. State*, 37 N.Y.2d 378 (1975).................................................................................23, 24, 25

*Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932 (1999) ................................................ *passim*

*Kennedy v. McKesson Co.*, 58 N.Y.2d 500 (1983)......................................................................22, 23

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018)............................................19

*L.L. v. Med. Protective Co.*, 362 N.W.2d 174 (Wis. Ct. App. 1984)................................................5

*Levine v. Behn*, 282 N.Y. 120 (1940) ...............................................................................................19

*Mortimer v. City of New York*,

No. 15-cv-7186 (KPF), 2018 WL 1605982 (S.D.N.Y. Mar. 29, 2018)............................24

*N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247 (2002) ................................................ *passim*

*Ornstein v. N.Y.C. Health & Hosps. Corp.*, 10 N.Y.3d 1 (2008) .............................22, 23

*Palin v. New York Times Co.*, 904 F.3d 804 (2d Cir. 2019) ........................................18

*Palsgraf v. Long Is. R. R. Co.*, 248 N.Y. 339 (1928)...................................................24

*Papasan v. Allain*, 478 U.S. 265 (1986) ...................................................................17

*Princeton Ins. Co. v. Chunmuang*, 698 A.2d 9 (N.J. 1997)............................................5

*Riviello v. Waldron*, 47 N.Y.2d 297 (1979) .................................................................8

*Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189 (1985)............................................14

*Sims v. Bergamo*, 3 N.Y.2d 531 (1957) ......................................................................8

*Sindle v. New York City Transit Auth.*, 33 N.Y.2d 293 (1973)......................................11

*St. Paul Fire & Marine Ins. Co. v. Asbury*, 720 P.2d 540 (Ariz. Ct. App. 1986).....................5, 6

*St. Paul Fire & Marine Ins. Co. v. Jacobson*, 826 F. Supp. 155 (E.D. Va. 1993)......................5

*St. Paul Fire & Marine Ins. Co. v. Love*, 447 N.W.2d 5 (Minn. Ct. App. 1989) ......................5

*St. Paul Fire & Marine Ins. Co. v. Shernow*, 610 A.2d 1281 (Conn. 1992)................................5

*St. Paul Fire & Marine Ins. Co. v. Torpoco*, 879 S.W.2d 831 (Tenn. 1994) ................................5

*Stone v. Eisen Co.*, 219 N.Y. 205 (1916) ......................................................................10

*Streep v. Simpson*, 80 Misc. 666 (2d Dep't 1913) .......................................................24

*Taggart v. Costabile*, 131 A.D.3d 243 (2d Dep't 2015) .................................................22

*Tobin v. Grossman*, 24 N.Y.2d 609 (1969)...................................................................22

*Van Dongen v. CNinsure, Inc.*, 951 F. Supp. 2d 457 (S.D.N.Y. 2013) .........................19

*Vigilant Ins. Co. v. Kambly*, 319 N.W.2d 382 (Mich. Ct. App. 1982) ............................5

*Zipkin v. Freeman*, 436 S.W.2d 753 (Mo. 1968)..........................................................5

**Rules**

CPLR § 214-g ..................................................................................................................11

Federal Rule of Civil Procedure 12(b)(6) ................................................................3, 4, 17, 18

Individual Practices Rule 2.D. ........................................................................................12

**Other Authority**

Prosser, *Torts* § 69 (4th ed.)..........................................................................................9

Prosser, *Torts* § 70 (4th ed.)..........................................................................................9

Restatement (Second) of Torts § 46(1) (1965) ...............................................................16

Restatement (Second) of Torts § 652B ...........................................................................15

Seavey, *Agency* § 83 .....................................................................................................9

## INTRODUCTION

Plaintiff Jeffrey M. Poppel was born with birth defects, among which was short stature, and when was a young boy, he was a patient of Reginald Archibald, a nationally renowned pediatric endocrinologist who specialized in children who suffered from short stature. However, upon his first appointment, Mr. Poppel suffered severe sexual abuse at the hands of Archibald. As Archibald did with other children, he got Mr. Poppel into the examination room alone, and there required him to take off his clothing and pose nude for photographs. Then, Archibald told Mr. Poppel he needed to measure his penis, both flaccid and erect, to determine what size Mr. Poppel would ultimately grow up to be. Next, he made Mr. Poppel masturbate for him, and when Plaintiff—scared and intimidated by the scientific-sounding jargon Archibald used—could not complete the task as directed, Archibald picked him up and placed him on his knee. There, he groped and fondled Mr. Poppel, trying to make the young boy ejaculate.

It was 1975, and Mr. Poppel was 11 years old; Rockefeller had known for more than a decade of complaints that Archibald regularly sexually abused his young patients. Yet, during that time, it had done nothing: Rockefeller had not undertaken a further investigation of Archibald; it had not separated him from the thousands of child patients that regularly saw him; it had not disciplined him; it had not suspended him; it had not terminated him; it had not contacted the police or the district attorney.

Mr. Poppel, like other victims of child sexual abuse, struggled with anxiety and depression. But he did his best to pick up his life and make the most of it. He moved to Florida and went to law school.

Then, after years of silence, despite knowing of complaints about sexual abuse perpetrated by Archibald for decades, and having in fact formally found them credible in 2004,

1

Rockefeller chose to send investigatory letters to its former patients on the very eve of the passage of the Child Victims Act ("CVA").

Mr. Poppel brought the instant lawsuit asserting individual claims for the sexual abuse he suffered and also claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and intrusion upon seclusion individually and behalf of a class of former Archibald patients who received Rockefeller's investigatory letter.

Now, Rockefeller asks this Court to dismiss the vast majority of Mr. Poppel's First Amended Complaint ("Complaint" or "FAC"). With respect to Archibald's rampant sexual abuse, Rockefeller denies that it is vicariously liable, despite the fact it has defended his conduct as ordinary medical treatment for the time elsewhere. Additionally, Rockefeller believes that the CVA does not apply to certain claims. Finally, with respect to Rockefeller's highly offensive investigatory letter, Rockefeller makes what amounts to a factual argument, characterizing the letter as an "Outreach Letter." This is perhaps a fine jury argument; but Rockefeller's post hoc straining to convert its letter into harmless outreach highlights that Rockefeller's intent in sending the letter is a quintessential question of fact, making resolution of the class claims inappropriate for even summary judgment, let alone a motion to dismiss.

This Court should deny Rockefeller's motion to dismiss. *First*, Rockefeller is appropriately held vicariously liable under New York law because the sexually abusive conduct was inextricably intertwined with the very medical treatment Plaintiff sought. *Second*, the CVA broadly revives "every civil claim or cause of action" for injuries "suffered *as a result* of conduct which would constitute a sexual offense," including Plaintiff's fraud and false imprisonment claims. *Third*, Plaintiff has adequately pled claims for emotional distress and intrusion upon seclusion based upon Rockefeller's outrageous and offensive investigatory letter. Rockefeller's

effort to spin its letter as "outreach" actually highlights that its motivation is a quintessential question of fact not suited for summary dismissal.

Accordingly, this Court should deny Rockefeller's motion to dismiss and schedule a Rule 16 conference so that the parties may begin the discovery process.

## LEGAL STANDARD

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Gibbons v. Malone*, 703 F.3d. 595, 599 (2d Cir. 2013).[1] "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Davis v. N.Y.C. Hous. Auth.*, 379 F. Supp. 3d 237, 244 (S.D.N.Y. 2019) (quoting *Iqbal*, 556 U.S. at 678). To determine whether a complaint's allegations are plausible, a court "draw[s] on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

When resolving a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [the plaintiffs] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011); *see also Chase Group Alliance LLC v. City of New York Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010) (holding a court evaluating a motion to dismiss must "the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's

---

[1]     "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

favor'" (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)); *In re Thelen LLP*, 736 F.3d 213, 218 (2d Cir. 2013) (holding a court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in [the] plaintiff's favor"). "In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (quoting *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998)).

**ARGUMENT**

## I. ROCKEFELLER IS VICARIOUSLY LIABLE FOR ARCHIBALD'S SEXUAL ABUSE.

Rockefeller denies that it is vicariously liable for Archibald's decades of abuse. Plaintiff acknowledges that the New York Court of Appeals has, under distinguishable circumstances, held that a hospital is not vicariously liable for the sexual assaults of its employees. *See N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247, 251–52 (2002); *Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999). Yet, a review of not only those cases but the rest of New York's respondeat superior jurisprudence, as well as cases from other jurisdictions that are actually factually similar to this case, shows that Rockefeller is appropriately vicariously liable under New York law. Furthermore, while Rockefeller denies that Archibald's sexual abuse was within the scope of his employment here, it has taken the precisely opposite position elsewhere. Even if the sexual were not in the scope of Archibald's employment, however, Rockefeller would be vicariously liable under good New York law dating back nearly a century.

### A. Archibald's sexual abuse was in the scope of his employment.

This case is factually dissimilar from *Judith M.*, where an orderly assaulted a patient, 93 N.Y.2d at 933, and *N.X.*, where the resident assaulted an anesthetized patient recovering from

surgery, 97 N.Y.2d at 250. In contrast, Dr. Archibald's sexual abuse was always in the course of, and thus "inextricably intertwined and inseparable from," the medical treatment he provided at Rockefeller Hospital for nearly half a century. *St. Paul Fire & Marine Ins. Co. v. Shernow*, 610 A.2d 1281, 1285 (Conn. 1992). This is a meaningful difference, and it calls for a different result.

When states have had to squarely confront situations where sexual abuse occurred during examinations—as, for example, a doctor who inappropriately "manipulated [female patients'] clitorises while performing routine gynecological examinations," *see St. Paul Fire & Marine Ins. Co. v. Asbury*, 720 P.2d 540, 542 (Ariz. Ct. App. 1986)—they have not hesitated to recognize that the physician's sexual abuse was within the scope of the medical services provided.[2] *See, e.g.*, *Shernow*, 610 A.2d at 1285; *Princeton Ins. Co. v. Chunmuang*, 698 A.2d 9, 14 (N.J. 1997); *St. Paul Fire & Marine Ins. Co. v. Love*, 447 N.W.2d 5, 9–10 (Minn. Ct. App. 1989); *St. Paul Fire & Marine Ins. Co. v. Torpoco*, 879 S.W.2d 831, 834 (Tenn. 1994); *see also St. Paul Fire & Marine Ins. Co. v. Jacobson*, 826 F. Supp. 155, 164 & n.11 (E.D. Va. 1993) (collecting cases).[3]

These courts have had no trouble distinguishing cases where, like *N.X.* and *Judith M.*, the sexual assault represented a clear departure from the kind of treatment the patient had sought. *See, e.g.*, *Shernow*, 610 A.2d at 1283–84 (distinguishing *Hirst v. St. Paul Fire & Marine Ins. Co.*, 683 P.2d 440 (Idaho Ct. App. 1984), where a physician drugged and then molested a patient who sought care for a hand injury). In the words of the Arizona Court of Appeals, *Hirst*, like

[2]     Plaintiff acknowledges these are malpractice insurance coverage cases. However, given the substantial conceptual overlap between insurance coverage and respondeat superior liability, they are highly persuasive authority in this context.

[3]     An identical line of cases has applied this principal similarly to therapists and psychologists who induce patients to enter into a sexual relationship as a part of "therapy." *See, e.g.*, *Vigilant Ins. Co. v. Kambly*, 319 N.W.2d 382, 385 (Mich. Ct. App. 1982); *Zipkin v. Freeman*, 436 S.W.2d 753, 762 (Mo. 1968); *L.L. v. Med. Protective Co.*, 362 N.W.2d 174, 178 (Wis. Ct. App. 1984).

*N.X.* and *Judith M.*, was "distinguishable because the tortious sexual abuse of the patient was not intertwined with and inseparable from the services provided." *Asbury*, 720 P.2d at 542.

The sexual abuse Archibald committed was plainly in the course of the medical treatment he provided. It may have been for "Archibald's own sexual gratification," FAC ¶ 147, but his subjective desire is not the standard; the standard whether—objectively speaking—the abuse is inextricably intertwined with medical care and whether it furthers the hospital's business. *See N.X.*, 97 N.Y.2d at 251–52. And here, it surely did. Archibald was a preeminent pediatric endocrinologist. FAC ¶ 33. As Mr. Poppel demonstrates, he drew patients from other states, and Rockefeller "represented to the community and to patients that Archibald was safe, trustworthy, and of high moral and ethical repute." FAC ¶ 34.

The abuse took place in Rockefeller's exam rooms and using Rockefeller's equipment, all with the knowledge of Rockefeller staff members. FAC ¶¶ 52–54. Archibald measured young boys' penises both flaccid and erect, a fact which is routinely confirmed in medical records, and which Rockefeller's physician-in-chief was made aware of at the time. FAC ¶¶ 43, 86, 142–43. Highlighting how inside the scope of employment his behavior was, the physician-in-chief thought the practice of measuring young boys' penises was "questionable," but apparently permitted Archibald to continue on his practice. *See* FAC ¶ 86. Archibald was able to publish articles documenting his "treatment," and at least two article contain naked photos of young male patients of his. FAC ¶ 51. Indeed, the hospital was well aware of Archibald's photography. FAC ¶ 55. All of these acts, which were taken with the knowledge of Rockefeller, were carried out under the auspices of "providing medical care." FAC ¶ 56. In sum, "Archibald was acting within the scope of his employment in meeting with patients of the Hospital for treatment." FAC ¶ 304.

Rockefeller actually agrees: Even the May 2019 investigative report of Debevoise & Plimpton—completed at Rockefeller's request and on its behalf—opined that Dr. Archibald's acts were "within the range of reasonably accepted practices for the time," despite also concluding that those acts ultimately constituted sexual abuse.[4] Debevoise & Plimpton LLP, *Report on the Investigation of Dr. Reginald Archibald*, at 8. Debevoise's investigative report goes on to call Dr. Archibald's sexual abuse a part of "legitimate procedures Archibald used in his practice." *Id.* at 12.

More importantly, Rockefeller's argument here is directly contrary to its stances and pleadings in litigation with its various insurers (*see* Complaint, NYSCEF Doc. 1, *The Rockefeller University v. Aetna Ins. et al.*, Index No. 654425/2019 (Sup. Ct. N.Y. Cty.)). There, Rockefeller makes the opposite claim, arguing that it believes it is liable and that therefore its insurers ought to indemnify it in accordance with "the type of substantial potential liability for which the University purchased insurance in the first place." Complaint, NYSCEF Doc. 1, at ¶ 3.[5] Indeed, as Exhibit A to Rockefeller's state court complaint itself suggests, Rockefeller's insurance policies kick in when an employee commits a tort "within the scope of their duties."

In essence, Rockefeller wants to employ the collective horror and opprobrium rightly directed at Archibald's reprehensible, sexually abusive medical care by present standards and then, looking back, say that it must necessarily have been outside the scope of his employment at

---

[4]    Debevoise's investigative report is incorporated in Plaintiff's Amended Complaint by reference. Amended Complaint ¶ 83 n.4. Debevoise's investigative report is annexed hereto for the Court's convenience as Exhibit 1.

[5]    Rockefeller's state court complaint is annexed hereto for the Court's convenience as Exhibit 2. At this time, Exhibit 2 does not include Rockefeller's many exhibits, but Plaintiff will provide them for the Court upon the Court's request.

the time.[6] But, as above, when Rockefeller is in a different courtroom, it tells a different story. In that other courtroom, it asks for a ruling that while horrific and clearly inappropriate when judged by modern standards, Archibald's abuse was within the scope of ordinary treatment for the time, such that its insurers should foot the bill. This Court should not let Rockefeller have its cake and eat it too.

This is in accord with New York's rules pertaining to respondeat superior when the intentional tort at issue is not a sexual assault. For example, in *Sims v. Bergamo*, 3 N.Y.2d 531, 534 (1957), the Court of Appeals recognized that a bartender's assault of an unruly patron, even "though undertaken through a lack of discretion or infirmity of temperament," presented a question of fact—not subject to dismissal as a matter of law—as to whether the assault was within the scope of employment. To be clear, the bartender's job was to serve drinks, not to assault patrons. Indeed, cases like *Sims* (and the line of cases that follow it) recognize that an employer's liability for its employee's intentional torts may necessarily go "beyond the strict line of [the employee's] duty or authority." *De Wald v. Seidenberg*, 297 N.Y. 335, 338 (1948). After all, few (if any) employees have a scope of duties that includes wrongfully committing intentional tortious conduct. It is why "[t]he definition of 'scope of employment' *has not been an unchanging one*." *Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979) (emphasis added).

The reason New York courts have updated their conception of the "scope of employment" from time to time owes to a several considerations:

> Among motivating considerations are the escalation of employee-produced injury, concern that the average innocent victim, when relegated to the pursuit of his

---

[6]     Of course, if Archibald's sexually abusive behavior was as far outside the scope of employment as Rockefeller argues, then Rockefeller's negligence in failing to supervise Archibald becomes manifestly wanton and reckless. After all, Archibald measured young boys' penises, both flaccid and erect, a fact which is amply confirmed by glancing at the patients' medical records. *See* FAC ¶¶ 43, 86, 142–43.

claim against the employee, most often will face a defendant too impecunious to
meet the claim, and that modern economic devices, such as cost accounting and
insurance coverage, permit most employers to spread the impact of such costs.

*Id.* at 303 (citing Prosser, *Torts* § 69 (4th ed.) and Seavey, *Agency* § 83). Additionally, New York

courts consider various factors, including:

the connection between the time, place and occasion for the act; the history of the
relationship between employer and employee as spelled out in actual practice;
whether the act is one commonly done by such an employee; the extent of
departure from normal methods of performance; and whether the specific act was
one that the employer could reasonably have anticipated.

*Id.* (citing Prosser, *Torts* § 70, at 461).

Each of these factors and considerations supports a conclusion that Rockefeller should be

vicariously liable for Archibald's sexual abuse. Because Archibald has died and his estate may

be closed, he may be the ultimate impecunious perpetrator. Rockefeller has insurance that it is

currently pursuing (and for which it claims Archibald acted within the scope of his employment).

Rockefeller not only could have reasonably anticipated the sexual abuse—Archibald was a

doctor examining children, including young boys and their penises, in a closed room without any

nurse or parents present—but in "actual practice" it knew of complaints of the abuse for the vast

majority of Archibald's employment. Further, as Archibald itself argues elsewhere, the abuse

was part and parcel of the "normal methods of performance." In short, the sexual abuse

Archibald perpetrated was well within the scope of his employment.

In light of the above, this Court should, as a New York state appellate court likely would,

recognize that *N.X.* and *Judith M.* cover only one specific application New York's rule for

vicarious liability for intentional torts. *See In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d 348,

364 (S.D.N.Y. 2005); *see also DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005) ("In the

absence of authoritative law from the state's highest court, we must either (1) predict how the

New York Court of Appeals would resolve the state law question, or, if state law is so uncertain

that we can make no reasonable prediction, (2) certify the question to the New York Court of Appeals for a definitive resolution."). The New York Court of Appeals would not turn a blind eye to the facts of this case and to Rockefeller's own words and erstwhile pleadings, and would not reflexively apply *N.X.* and *Judith M.* to the far different factual circumstances of this case.

> **B.      Even if Archibald's sexual abuse was outside the scope of employment, century-old New York case law makes employers liable for sexual abuse committed in unusual situations.**

Even if Dr. Archibald's conduct was outside the scope of his employment, the New York Court of Appeals has explained that "[a]lthough normally it is necessary that the act complained of actually be within the scope of employment," exceptions to that general rule have long existed in New York for "unusual situations." *Cornell v. State*, 46 N.Y.2d 1032, 1033 (1979) (citing *Stone v. Eisen Co.*, 219 N.Y. 205 (1916)).

In point of fact, where there was "exposure of [the plaintiff's body] as an incident to the employment," the New York Court of Appeals has not hesitated to find an employer vicariously liable for sexual assault. *Stone*, 219 N.Y. at 209. *Stone* is instructive. There, the defendant, "corporation engaged in the business of making, buying, and selling medical and surgical appliances and implements and in diagnosing, treating, and prescribing for persons suffering with injured or deformed feet or limbs, and in furnishing appliances for the correction and cure of such deformities," and the defendant's employee "feloniously assaulted plaintiff by laying his hands upon her and with his hands held her on the table and attempted to have and hold sexual intercourse with plaintiff." *Id.* at 208. The Court of Appeals held that "As the defendant knowingly put the plaintiff in its employee's immediate and exclusive presence and then subjected her to an exposure of her limbs as an incident to the employment, it is responsible for his treatment of her and answerable for [the sexual abuse]." *Id.* at 209.

10

This situation is nearly the same, except that here Rockefeller routinely exposed helpless children to a monster for more than four decades. This "unusual situation[]," *Cornell*, 46 N.Y.2d at 1033, is compounded and made all the more unusual by the legislature's policy decision to make old the perpetrators of sexual abuse and their employers liable irrespective of the statute of limitations. Undoubtedly, the circumstances the CVA creates can be considered out of the ordinary. But, in those situations, New York law and policy—as codified in the CVA—imposes liability; it does not exculpate rampant wrongdoing.

## II.   PLAINTIFF'S INDIVIDUAL CLAIMS ARE ALL REVIVED BY NEW YORK'S CHILD VICTIMS ACT.

Rockefeller next contends that certain claims—fraud and false imprisonment—are "not premised on alleged sexual abuse by Dr. Archibald" and therefore are not "revived by the CVA." Rockefeller Br. at 9. Rockefeller does not explain its reasoning in the slightest. However, the ostensible thinking behind its argument here is that fraud and false imprisonment do not contain as an explicit element an act of sexual abuse. At any rate, Rockefeller does not provide any textual, legal, or factual basis for so limiting the ambit of the most remarkable remedial statute the New York legislature has passed in decades.

Whatever Rockefeller's reasoning, its conclusion is wrong. The CVA amply revives Plaintiff's fraud and false imprisonment claims. The CVA does not create a civil cause of action for criminal sexual abuse; rather, it revives "every civil claim or cause of action" for injuries "suffered *as a result* of conduct which would constitute a sexual offense." CPLR § 214-g (emphasis added). In other words, it is not claim specific. And, for sure, the acts of sexual abuse that Archibald committed would constitute "damages" in a fraud cause of action. *See Epiphany Cmty. Nursery Sch. v. Levey*, 171 A.D.3d 1, 8 (1st Dep't 2019) (stating the elements of a cause of action for fraud under New York law). Likewise, the sexual abuse constitutes a bodily injury,

and the New York Court of Appeals has said, "Where the damages follow as a consequence of the plaintiff's detention without justification [i.e., the plaintiff's false imprisonment], an award may include those for bodily injuries." *Sindle v. New York City Transit Auth.*, 33 N.Y.2d 293, 298 (1973). There is simply no basis for arbitrarily limiting the claims revived by the CVA to include one branch of intentional torts (say, assault and battery, for example) but not another (such as fraud or false imprisonment) equally capable of redressing a plaintiff's personal injuries.

In short, the CVA is not so conceptually circumscribed as Rockefeller contends. Accordingly, the Court should not dismiss Plaintiff's fraud and false imprisonment claims.

## III.   ROCKEFELLER DID NOT SIGNAL ITS INTENT TO CHALLENGE PLAINTIFF'S NEGLIGENT HIRING CLAIM IN ITS PRE-MOTION LETTER.

Rockefeller argues that Plaintiff's Complaint does not currently include sufficient allegations to make out a claim for negligent hiring.[7] Plaintiff acknowledges that the allegations as to negligent hiring are currently thin. When Rockefeller submitted its pre-motion letter, it did not address negligent hiring or indicate that Rockefeller would seek dismissal of that aspect of Count VI. *See* ECF Doc. 66. Indeed, Plaintiff's pre-motion response letter specifically recognized the absence of any intention on Rockefeller's part to seek dismissal of Plaintiff's negligent hiring claim. *See* ECF Doc. 67.

Had Rockefeller done so, Plaintiff would have forthrightly acknowledged the state of his pleadings as to negligent hiring at that time. Plaintiff would have, in his pre-motion response letter, asked for leave to amend the Complaint to correct this defect at that time. *See* Individual Practices Rule 2.D.

---

[7]      Rockefeller does not challenge the other aspects of Count VI of Plaintiff's Complaint, namely, the negligent supervision and retention claims.

After all, publically available knowledge about what Rockefeller knew of Archibald's sexual abuse and when continues to grow. When Plaintiff elected to include negligent hiring with his Amended Complaint, Rockefeller's own investigation in late May 2019 (conducted by its attorneys Debevoise & Plimpton) had revealed that Rockefeller's President was made aware of a grand jury investigation in Archibald's sexually abusive conduct as early as 1960. This was a dramatic extension of Debevoise's previous finding that Rockefeller had received complaints about Archibald in the 1990s. Suffice to say, the state of public knowledge about what Rockefeller knew and when is a rapidly evolving subject.

It may be that Archibald was arrested on a sexual offense before being hired by Rockefeller in 1940. If so, that would constitute a reason why Rockefeller either should never have hired him in the first place, or at a bare minimum conducted a more thorough investigation. Accordingly, Plaintiff respectfully requests the Court grant him leave to amend his Complaint to more fully state a claim for negligent hiring.

## IV.   PLAINTIFF HAS ADEQUATELY PLED CLAIMS FOR EMOTIONAL DISTRESS AND INTRUSION UPON SECLUSION BASED UPON ROCKEFELLER'S OUTRAGEOUS INVESTIGATORY LETTER.

### A.   Florida law applies to Plaintiff's letter claims.

To the extent that there are differences between New York and Florida law with respect to Plaintiff's letter claims,[8] Florida law applies. "New York's choice of law analysis, commonly

---

[8]   "The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *Allstate Ins. Co. v. Stolarz*, 81 N.Y.2d 219, 223 (1993). "Where no conflict exists between the laws of the jurisdictions involved, there is no reason to engage in a choice of law analysis." *Elson v. Defren*, 283 A.D.2d 109, 114 (1st Dep't 2001). Plaintiff does not see a dispositive conflict between New York's and Florida's law regarding emotional distress. As a result, for the convenience of the Court and the parties Plaintiff will address New York law regarding his emotional distress claims. However, as Rockefeller's motion highlights, an irreconcilable conflict exists between Florida and New York law as to Plaintiff's intrusion upon seclusion claims.

referred to as an 'interest analysis,' involves several steps and focuses on determining which jurisdiction, 'because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation.'" *Devore v. Pfizer Inc.*, 58 A.D.3d 138, 140–41 (1st Dep't 2008) (quoting *Cooney v. Osgood Mach. Inc.*, 81 N.Y.2d 66, 72 (1993)).

When determining which State's tort law to apply, a distinction must be "drawn between laws that regulate primary conduct (such as standards of care) and those that allocate losses after the tort occurs (such as vicarious liability rules)." *Cooney*, 81 N.Y.2d at 72. Since torts are classic "conduct regulating" rules, and New York's choice-of-law methodology nearly uniformly applies the conduct regulating rules of the situs of the injury in a multi-state tort. *Id.*[9]

However, when courts are faced with multi-state torts, like Rockefeller's tortious investigatory letter, the New York Court of Appeals has articulated a specific rule. "[W]hen the defendant's negligent conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred." *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 194–96 (1985). The injuries here (emotional distress and the intrusion upon Plaintiff's seclusion) are the last events necessary to make Rockefeller liable, and they occurred in Florida. Accordingly, the place of the wrong is Florida, and under New York's choice-of-law principles as determined by the Court of Appeals in *Schultz*, the law of Florida applies to Plaintiff's letter claims to the extent

---

[9]   To be clear, this does not require applying any other state's law to the underlying abuse claims. New York courts (and Second Circuit courts applying New York's choice-of-law rules) routinely employ the doctrine of dépeçage and apply the rules of different legal systems to different issues where appropriate. *See Bigio v. Coca-Cola Co.*, 675 F.3d 163, 169 (2d Cir. 2012).

a conflict exists.[10] Indeed, it might be said that Florida has the "predominant, if not exclusive, concern" in having its law applied to a highly offensive letter that intruded upon the seclusion of one of its citizens. *See Babcock v. Jackson*, 12 N.Y.2d 473, 483 (1963).

       **B.**    **Plaintiff has adequately pled an intrusion upon seclusion claim.**

Rockefeller makes a single argument[11] in favor of dismissing Plaintiff's intrusion upon seclusion claim: New York law does not recognize the tort of intrusion upon seclusion. *See Howell v. New York Post Co.*, 81 N.Y.2d 115, 123–24 (1993). Therefore, in Rockefeller's view, if New York law applies, then Plaintiff's intrusion upon seclusion claim must fail. Plaintiff recognizes and does not dispute *Howell*. However, as explained above, New York's choice-of-law principles make clear that Florida law applies to Plaintiff's intrusion upon seclusion claim. Consequently, Rockefeller's assertion that New York's absence of an intrusion upon seclusion precludes Plaintiff's intrusion claim is simply wrong.

And, to be clear, Florida courts recognize invasion of privacy as an intentional tort encompassing a cause of action for intrusion upon seclusion. *Cason v. Baskin*, 155 Fla. 198, 220 (1944) (recognizing invasion of privacy); *Agency for Health Care Admin. v. Associated Indus. of Fla.*, 678 So.2d 1239, 1252 n. 20 (Fla.1996), *cert. denied*, 520 U.S. 1115 (1997) (recognizing "intrusion—physically or electronically intruding into one's private quarters" as one of four invasion of privacy actions).

---

[10]      To the extent that it is inconsistent with *Schultz*, Rockefeller's cited authority, *AHW Inv. P'ship, MFS, Inc. v. Citigroup Inc.*, 661 Fed. App'x 2, 5 (2d Cir. 2016), is incorrect and should be disregarded.

[11]      Second Circuit courts do not consider arguments impermissibly raised for the first time in reply briefing. *See Jiles v. Rochester Genesee Reg'l Transp. Auth.*, 317 F. Supp. 3d 695, 701 (W.D.N.Y. 2018). "It is well settled that courts should not consider arguments first raised in a party's reply brief which afford no opportunity for response from the opposing party." *Haywin Textile Prods., Inc. v. Int'l Fin. Inv.*, 137 F. Supp. 2d 431, 434 n.2 (S.D.N.Y. 2001).

Under the Restatement, intrusion upon seclusion has three elements: (i) intentional intrusion, physical or otherwise, (ii) upon the solitude, seclusion, or private affairs or concerns of another, (iii) if the intrusion would be highly offensive to a reasonable person. Restatement (Second) of Torts § 652B. Plaintiff's Complaint meets this standard: a letter send to the homes of sex abuse survivors reminding them of the sex abuse they suffered—for no good reason at all— is a highly offensive intrusion upon their seclusion and private affairs, particularly when it brings the abuse flooding back to their mind and impedes their right to process the abuse at the time and place, and in the manner, of their choosing. *See* FAC ¶¶ 182–200.

Accordingly, Rockefeller's motion to dismiss Plaintiff's intrusion upon seclusion claim must be denied.

### C.   Plaintiff has adequately pled an intentional infliction of emotional distress claim.

New York law is clear, "'One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress.'" *Howell*, 81 N.Y.2d at 121 (quoting Restatement (Second) of Torts § 46(1) (1965)). The tort of intentional infliction of emotional distress ("IIED") "has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Id.* Rockefeller challenges two of these elements. First, it attempts to argue the letter was not extreme and outrageous. Second, it attempts to argue there are no allegations that support an inference that it either acted intentionally or in "disregard of a substantial probability" that its letter would cause severe emotional distress. Both arguments fail.

16

### 1. Rockefeller's investigatory letter was extreme and outrageous.

First, Rockefeller makes a transparent attempt to hijack the appropriate standard of review. Throughout its brief, Rockefeller recasts its letter as an "outreach letter," and argues that the letter does not rise to the level of outrageous conduct. In effect, Rockefeller is asking this Court to adopt its self-serving spin regarding an investigatory letter it sent to thousands of sexual abuse survivors for no purpose other than identifying potential opponents in litigation—and soliciting them to provide personal information to Rockefeller's lawyers without the decency of identifying of Rockefeller's counsel as a law firm.

This attempt runs directly counter to Second Circuit precedent forbidding district court's from making the kind of credibility determination Rockefeller seeks. Calling its investigatory letter an "outreach letter" might be a fine jury argument; but it at most highlights the issue of Rockefeller's intent in sending the letter—a quintessential question of fact—which requires denial of a motion to dismiss. Quite so: the Second Circuit recently reversed a 12(b)(6) dismissal where the district court "'assay[ed] the weight of the evidence' of repudiation and improperly chose between reasonably competing interpretations." *DiFolco*, 622 F.3d at 113.

And, for sure, Plaintiff's letter claims are not just "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663. Nor are Plaintiff's allegations regarding the letter merely "'legal conclusion[s] couched as a factual allegation[s].'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Indeed, they are not the kind of "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" the Supreme Court has cautioned lower courts about. *Iqbal*, 556 U.S. at 678.

On the contrary, Plaintiff's allegations are eminently plausible: Archibald molested hundreds, perhaps thousands, of children in Rockefeller Hospital over forty years, a fact Rockefeller does not contest. Rockefeller admits it received complaints at least in the 1990s, and

17

completed a thorough investigation in 2004, in which Rockefeller found the complaints credible. Yet, it never made any "outreach" efforts before. When the Court properly "assume[s] the[] veracity" of these well-pleaded factual allegations, the Plaintiff's letter claims are exceedingly plausible.

In truth, if anything, it is Rockefeller's spin that lacks even a whiff of plausibility. It bears repeating: If the letter was meant as a harmless outreach, why send it on the eve of the CVA's passage? Why not send it in 2004, the 1990s, or earlier when Archibald could be prosecuted? The point, of course, is that Rockefeller could never be bothered to reach out to Archibald's victims until it was clear they would very soon be able to sue Rockefeller en masse. It was only then, when the CVA's passage was bearing down that Rockefeller jumped to get in touch with Archibald's victims and solicit them to nail down their stories with Rockefeller's attorneys.

But even if Rockefeller's characterization of the letter as an "outreach letter" were more plausible than the allegations in Plaintiff's Complaint, it would still be error to adopt Rockefeller's spin. The Second Circuit recently cautioned that "it is not the district court's province to dismiss a plausible complaint because it is not as plausible as the defendant's theory." *Palin v. New York Times Co.*, 904 F.3d 804, 815 (2d Cir. 2019). "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion.'" *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184–85 (2d Cir. 2012)). So, even if Rockefeller's position was more plausible, it would still be error to adopt its factual position and dismiss Plaintiff's letter claims.

By analogy, Rockefeller's portrayal regarding its investigatory letter is even less persuasive on a motion to dismiss than a defendant who seeks to put forth its own version of the

facts through judicial notice or incorporation of documents by reference. The Second Circuit has held that it is "error" to accept a defendant's external materials to convince to "make a finding of fact that controverted the plaintiff's own factual assertions set out in its complaint." *Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006). As the Ninth Circuit has put it, "If defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as [true]—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently plausible claim for relief." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–99 (9th Cir. 2018).

At least defendants asking a court to judicially notice documents can point to documents, but Rockefeller is simply asking the Court to take Rockefeller at its word as to its intent or motivation in sending the letter. And in that regard, intent is a quintessential fact question. *See, e.g.*, *In re McGrath*, 7 B.R. 496, 498 (S.D.N.Y. 1980); *Levine v. Behn*, 282 N.Y. 120, 126 (1940). Ultimately, Rockefeller's effort to characterize its letter "amount[s] to an appeal to the referee to call a foul while the opposing team is still announcing its lineup and taking the field." *Van Dongen v. CNinsure, Inc.*, 951 F. Supp. 2d 457, 470 (S.D.N.Y. 2013).

### 2. Rockefeller sent its investigatory letter to a group of people it believed contain survivors of child sexual abuse in disregard of a substantial probability that the letter would cause severe emotional distress.

Rockefeller next contends that the Complaint does not allege it acted in disregard of a substantial likelihood of causing severe emotional distress. As Rockefeller acknowledges, the Complaint alleges that Rockefeller "knew that it was substantially likely that its Letter would cause a significant number of Archibald's former patients to suffer immediate, long-lasting, and severe emotional distress" and that "Rockefeller was reckless and disregarded a substantial probability that the Letter would cause severe emotional distress by reopening the wounds of the victims of Archibald's sexual abuse." FAC ¶¶ 103, 322.

Yet, Rockefeller complains that, in its view, these are the only allegations pertaining to the letter, and that they are conclusory. This simply isn't true.

For instance, the Complaint points out that "[b]ecause of its previous investigations, Rockefeller was aware that there was a substantial likelihood that it was sending the Letter to survivors of child sexual abuse." FAC ¶ 102. Rockefeller knew that the statute of limitations for sex abuse claims had passed, and it was aware "that a substantial portion of the public is aware of the existence of various statute of limitations and that a substantial portion of the public— including Archibald's victims—would believe that abuse that occurred decades ago would be time barred." FAC ¶¶ 96–98. Not only were the recipients of the letter reminded of their own emotional distress, they learned for the first time that there were possibly many other victims. FAC ¶¶ 106, 107.

And why wouldn't these victims be distressed? These are people who were very likely to understand that something very wrong was done to them at a young age, and a time when the law cared very little for the abuse of children. And, so, now to be reminded of it, when they would reasonably believe (unless they closely followed New York's legislative developments, like Rockefeller did) that nothing can be done about it, Rockefeller sends them a letter, letting them know that Rockefeller believes they are a sexual abuse victim and would like them to tell someone (Rockefeller's lawyer) the grisly details of their abuse.

And, unlike many of the letter's recipients, Rockefeller knew in October 2018 that the New York legislature would soon pass a new statute—the CVA—that would revive those old claims. FAC ¶ 99. The investigatory letter was thus calculated "to gather information about potential plaintiffs in advance of litigation." FAC ¶ 101. This was a decision that "did not

comply with national best practices for investigating pervasive sexual abuse, especially pervasive childhood sexual abuse." FAC ¶ 105. After all:

> Communications with possible victims of sexual abuse in other high-profile investigations have taken pains to preserve witness and victim confidentiality. Similarly, other investigations have carefully identified investigators as attorneys when they are attorneys. The purpose of such disclosures is to prevent re-traumatization of victims. Other communications regarding mass sexual abuse have allowed victims to come forward on their own following public, non-targeted disclosures.

FAC ¶ 95. But Rockefeller didn't do any of that. It mentioned Helen Cantwell, and it mentioned Debevoise & Plimpton, but did not tell these likely survivors of child sexual abuse that this was Rockefeller's counsel, and that the survivor's stories could be put to use building defenses for the very claims New York's legislature had fought special interests tooth and nail to revive. *See* FAC ¶¶ 90–94.

These are not mere conclusory allegations. On the contrary, they set forth a clear and plausible claim for relief for the extreme and outrageous conduct of the investigatory letter and the severe emotional distress it caused.

Astonishingly, Rockefeller's argument appears to cast recriminations on sexual abuse survivors, accusing Plaintiffs of "undermin[ing] their own conclusory allegations . . . by also alleging that the University should have done outreach to former patients in 2004." Rockefeller Mem. at 15, 18. This argument spectacularly misses the point. The point of Plaintiff's emotional distress claims is not that outreach to a sex abuse survivor is *never permissible*, but that as sex abuse survivors, there is an especial likelihood that a letter dredging up memories of the perpetrator will be sincerely and poignantly distressful. Thus, there had better be a good reason for doing so. And attempting to get sex abuse survivors to give details to Rockefeller's legal counsel under the guise of "outreach" is emphatically a bad reason.

And the reason Plaintiff's pointed out that Rockefeller—if it honestly wanted to conduct outreach and pre-litigation investigation of potential litigants—could have done that very outreach earlier, in 2004. Thus, the fact that Rockefeller did not send its "outreach letter" until the eve of legislation that would potentially expose it to hefty civil liability for the sex abuse of its star physician and employee puts the lie to its claim that the letter is merely harmless outreach.

Accordingly, the Court should deny Rockefeller's motion to dismiss Plaintiff's IIED claim.

**D.**   **Plaintiff has adequately pled a negligent infliction of emotional distress claim.**

New York courts recognize a cause of action for negligent infliction of emotional distress ("NIED") for "injuries sustained although precipitated by a negligently induced mental trauma without physical impact." *Tobin v. Grossman*, 24 N.Y.2d 609, 613 (1969). Rockefeller contends that Plaintiff cannot make out an NIED claim for two reasons. First, Rockefeller contends that Plaintiff cannot show that investigatory letter was extreme and outrageous. Second, Rockefeller contends it did not owe Plaintiff a duty to avoid causing emotional distress.

Initially, Rockefeller reiterates its belief that its investigatory letter was not extreme or outrageous. However, New York's appellate courts have since clarified that "to the extent that certain of this Court's past decisions have indicated that extreme and outrageous conduct is an element of negligent infliction of emotional distress, those cases should no longer be followed." *Taggart v. Costabile*, 131 A.D.3d 243, 255 (2d Dep't 2015). After all, mention of "extreme and outrageous conduct" is conspicuously lacking from recent New York Court of Appeals decisions regarding NIED. *See Ornstein v. N.Y.C. Health & Hosps. Corp.*, 10 N.Y.3d 1, 6 (2008); *Kennedy v. McKesson Co.*, 58 N.Y.2d 500, 506 (1983).  At any rate, for the reasons set forth above,

whether Rockefeller's investigatory letter amounts to extreme and outrageous conduct is a question of fact, and this Court should deny this aspect of Rockefeller's motion.

Rockefeller also asserts that Plaintiff's NIED claim must fail because it lacked a duty to avoid causing its former patients—persons it knew or at least strongly suspected to be survivors of child sexual abuse—emotional distress. However, New York law recognizes a duty to avoid negligently causing emotional distress where there is "an especial likelihood of genuine and serious mental distress, arising from special circumstances, which serves as a guarantee that the claim is not spurious." *Johnson v. State*, 37 N.Y.2d 378, 382-83 (1975). As a recent Court of Appeals case put it: so long as "the mental injury is 'a direct, rather than a consequential, result of the breach' and when the claim possesses 'some guarantee of genuineness'" negligent infliction of emotional distress is compensable. *Ornstein*, 10 N.Y.3d at 6 (quoting *Kennedy*, 58 N.Y.2d at 506 (first quotation) and *Ferrara v. Galluchio,* 5 N.Y.2d 16, 21 (1958) (second quotation)).

Quite apart from supporting Rockefeller's position, *Johnson* and *Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000) actually illustrate how the special circumstances doctrine imposes a duty of care upon a hospital to avoid wrongly causing patients emotional distress. The hospital can breach its duty in various ways: it can erroneously inform a patient's next of kin that the patient has died, as in *Johnson*, 37 N.Y.2d at 382–83, or it can erroneously give a patient a false positive result on an HIV test, as in *Baker*, 239 F.3d at 418, 421.

And *Baker* also provides a demonstration of how New York courts flexibly apply the special circumstances doctrine. While other "AIDS-phobia" cases have required "actual exposure" to the AIDS virus, *see, e.g.*, *Brown v. N.Y.C. Health & Hosps. Corp.*, 225 A.D.2d 36, 45 (2d Dep't 1996), the Second Circuit in *Baker* had no trouble dispensing with that requirement:

"The requisite 'guarantee of genuineness,' which in an AIDS-phobia case is supplied by evidence of actual exposure to infection, is supplied in Baker's case by the positive test result." *Baker*, 239 F.3d at 422. In each case, resulting emotional harm was "within the 'orbit of the danger' and therefore within the 'orbit of the duty' for the breach of which a wrongdoer may be held liable." *See Johnson*, 37 N.Y.2d at 382 (quoting *Palsgraf v. Long Is. R. R. Co*., 248 N.Y. 339, 343 (1928)).

In short, Rockefeller's resort to purporting to require "a specific, recognized type of negligence," Rockefeller Mem. at 17 (quoting *Mortimer v. City of New York*, No. 15-cv-7186 (KPF), 2018 WL 1605982, at *27 (S.D.N.Y. Mar. 29, 2018), is entirely misplaced. Of course, it bears noting that Rockefeller carefully omitted the word "generally" from its quotation. The *Mortimer* court used the word "generally" for a straightforward reason: NIED is a common law doctrine, and each passing century has brought to light new fact patterns and "[c]onditions unknown to the ancient common law," which "requires elasticity in the application of the principles thereof." *Streep v. Simpson*, 80 Misc. 666, 668 (2d Dep't 1913).

And, a close reading of Rockefeller's brief shows that it does not seriously contest that it was foreseeable that former victims of child sexual abuse would be re-traumatized by pointlessly receiving an investigatory letter. Rather, Rockefeller's argument here is simply an effort to elevate a phantom formalism over the substantial harm it caused—and foresaw it would cause—to sex abuse survivors.

Rockefeller had a duty to refrain from re-traumatizing the victims of Archibald's sexual abuse, and it "knew that it was substantially likely that its Letter would cause a significant number of Archibald's former patients to suffer immediate, long-lasting, and severe emotional distress." FAC ¶ 103. Yet, it sent the letter anyway, and not for a good reason—it simply did it

24

so Rockefeller could get a leg up on a potential wave of sex abuse litigation. FAC ¶ 104. The breach of this duty created a likelihood of genuine and serious mental distress and ultimately caused the plaintiff to suffer substantial harm. In truth, Rockefeller's conduct here—soliciting child sexual abuse survivors to reveal details to Rockefeller's attorneys (all without keeping the fact of Rockefeller's attorney–client relationship with Debevoise concealed, no less)—is even worse than the conduct in *Johnson* and *Baker*. Indeed, while creating a fear of AIDS or anguish at the death of a loved one no doubt causes emotional distress, Rockefeller dredged up horrific memories in Mr. Poppel's mind, and immediately brought the sex abuse he suffered as a boy back to the forefront of his mind. FAC ¶¶ 185–190.

Regardless, New York courts have explained that "special circumstances" raise "issues of fact," which cannot be determined in a motion to dismiss. *Howard v. Sears, Roebuck & Co.*, 2 Misc. 3d 1004(A), 784 N.Y.S.2d 920 (Sup. Ct. Kings Cty. 2004). Accordingly, this Court should deny this branch of Rockefeller's motion to dismiss.

## CONCLUSION

Accordingly, Plaintiff respectfully requests that the Court deny Rockefeller's motion to dismiss and schedule a Rule 16 conference so that the parties may proceed with discovery.

Respectfully submitted,

LEVY KONIGSBERG LLP

*/S/ Renner K. Walker*
Renner K. Walker
Corey M. Stern
800 Third Ave., 11th Fl.
New York, NY 10022
(212) 605-6200
Rwalker@levylaw.com
Cstern@levylaw.com

*Counsel for the Plaintiff, Jeffrey M. Poppel,*
*on his own behalf and on behalf of all others*
*similarly situated*