**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED:  5/27/2020_____

JEFFREY M. POPPEL,
*on his own behalf and on behalf of all others*
*similarly situated*

                              **Plaintiff,**

              **-against-**

THE ESTATE OF DR. REGINALD
ARCHIBALD and THE ROCKEFELLER
INSTITUTE,

                              **Defendant.**

**1:19-CV-01403 (ALC)**

**OPINION & ORDER**

**ANDREW L. CARTER, JR., District Judge:**

There are two pending motions to dismiss in related cases before this Court: *Poppel v. Rockefeller University Hospital, et al.*, No. 19-CV-01403 (S.D.N.Y.) and *N.R. v. Estate of Dr. Reginald Archibald et al.*, No. 19-CV-07609 (S.D.N.Y.).[1]  Given the overlap in the underlying facts, causes of action, and briefing in these cases, the Court decides the two motions together. For the reasons set forth below, Defendant Rockefeller's motion to dismiss is **GRANTED** in part and **DENIED** in part.

## INTRODUCTION

This is a tragic case involving decades of sexual abuse by Dr. Reginald Archibald. Archibald, who was employed as a pediatric endocrinologist at the Rockefeller Institute, sexually abused patients, many of whom were disabled and suffered from growth deficiencies.  During an

---

[1] A third, related case, *P.N. v. Rockefeller Institute et al.*, No. 19-CV-10493 (S.D.N.Y.) is also pending before the Court.  In that case, the Court granted Defendants' request to extend the deadline to respond to the Complaint until 30 days after this Court issues a decision on the pending motions to dismiss in *Poppel* and *N.R.*

investigation into this misconduct, Rockefeller sent a letter to Archibald's former patients requesting any information they would like to share regarding their interactions with Archibald. Plaintiffs bring numerous claims against Defendant Rockefeller and Archibald's Estate, including for sexual abuse, assault, battery, fraud, false imprisonment, gross negligence, and medical malpractice; and claims against Defendant Rockefeller for negligent hiring, supervision, and retention, and for intentional and/or negligent infliction of emotion distress and intrusion upon seclusion. Because Archibald was not acting within the scope of his employment when he sexually abused his patients, Defendant Rockefeller cannot be held vicariously liable for his intentional torts. Plaintiffs' claims for negligent hiring, supervision, and retention survive. Finally, Plaintiffs' claims for intentional and/or negligent infliction of emotion distress and intrusion upon seclusion are dismissed because Plaintiffs do not adequately plead these causes of actions.

## BACKGROUND

### A. Factual Background

The following facts are taken from allegations contained in Plaintiff's Complaint and are presumed to be true for purposes of this motion.

Dr. Reginald Archibald was a preeminent pediatric endocrinologist at The Rockefeller University Hospital from the 1940s until the 1980s. *See* First Amended Complaint ("Poppel Compl.") (Docket 19-CV-1403; ECF No. 53) at ¶¶ 29–30. During his career with Rockefeller, he treated approximately 9,000 patients, many of whom were undersized and had trouble growing. *Id.* at ¶36. Plaintiffs allege that over the course of 40 years, Archibald sexually abused his patients, including by removing their clothes, measuring their genitalia, inappropriately touching them, masturbating them or asking them to masturbate to ejaculation, and taking sexually explicit photographs of them. *Id.* at ¶¶ 38–47.

On October 5, 2018, Rockefeller issued a statement indicating it had received reports of improprieties from some of Archibald's former patients in 2004 and 2018. *Id.* at ¶64.  Rockefeller retained Debevoise & Plimpton LLP in 2004 to investigate the allegations, and after an extensive investigation, including interviews with former patients, faculty, administrators and staff, Debevoise "found certain allegations credible and determined that it was likely that some of [] Archibald's behavior towards [the reporting patient in 2004] was inappropriate." *Id.* at ¶65.  After receiving another complaint from a former patient in 2018, Rockefeller again engaged Debevoise to investigate. *Id.* at 77–78.  On May 23, 2019, Debevoise filed a report that concluded that Archibald "engaged in a widespread pattern of misconduct and sexually abused many children at the Hospital over the course of many years when offering patients medical care and treatment." Report on the Investigation of Dr. Reginald Archibald ("2019 Debevoise Report") (ECF No. 71-1) at 1.

The 2019 Debevoise Report also concluded that Rockefeller was made aware of Archibald's conduct in a number of ways.  Periodically there were "questions and allegations" about Archibald's practices and Rockefeller "reported allegations of Archibald's improper behavior and abuse to various authorities in 1996, 2004, and 2018." *Id.* at 13.  For example, in the late 1960s, the New York County District Attorney's Office issued a grand jury subpoena for medical records of two former patients of Archibald, but he was never charged with an offense. The President of Rockefeller at the time, however, was made aware of the investigation. *Id.* at 13–14.  The physician-in-chief of the Hospital from 1960–74 also received "several complaints, during his tenure, from patients, family members, or staff about Archibald's examinations of patients' genitals." *Id.* at 13.  In 1996, Rockefeller received a letter from a former patient indicating that Archibald engaged in inappropriate sexual conduct in the 1960s and 70s. *Id.* at 15.  In 1998,

Rockefeller received an oral complaint from a former patient who commented on Archibald's inappropriate sexual conduct towards him. *Id.* at 15.

Rockefeller sent a brief letter to over 1,000 of Archibald's former patients (the "Letter"). In response to this outreach letter from the Hospital, over 900 individuals contacted Debevoise to share information about their experiences or on behalf of others. *See* 2019 Debevoise Report at 2. The Letter read:

> Our records indicate that, some decades ago, you may have been a patient at The Rockefeller University Hospital and seen by [] Reginald Archibald, who was at the Hospital from 1948–1982 and passed away in 2007. If we have contacted you in error, please disregard this letter.
>
> Based on reports from several former patients regarding Dr. Archibald's interactions with them, we are reaching out to as many of his patients as we can locate. We have hired Helen Cantwell, of Debevoise & Plimpton LLP, to assist us with this outreach. If you have information you would like to share regarding your interactions with [] Archibald, please contact Helen at: (212) 909-6312 or hcantwell@debevoise.com.
>
> Thank you for your consideration.

*Id.* at ¶90.  Plaintiffs allege that "[d]espite its awareness that it was sending its Letter to survivors of child sexual abuse and that its Letter would likely cause a significant number of the Letter's recipients to suffer severe emotional distress, Rockefeller sent the Letter anyways." *Id.* at ¶104. Moreover, Plaintiffs allege that "at least one purpose of Rockefeller's decision to send the Letter to more than a [sic] 1,000 former patients was to gather information about potential plaintiffs in advance of litigation." *Id.* at ¶101.

### B. **Plaintiff Poppel's Individual Allegations**

Plaintiff Poppel was born with congenital deformities of the upper extremities. *Id.* at ¶113. He was a patient at Rockefeller from approximately 1975 to 1980. *Id.* at ¶123.  On October 15, 1975, Poppel's father signed two consent forms in which he provided consent for "any routine

treatment and diagnostic procedure" and gave consent for "photographs of my child [Plaintiff] to be taken, only for medical and professional purposes." *Id.* at ¶124.  When Poppel visited Archibald for the first visit, Archibald took Poppel to a dimly lit examination room alone, told him to remove his clothing, and took nude photographs of Poppel. *Id.* at ¶138–140.  Archibald then measured Poppel's penis and instructed him to masturbate.  Poppel's arms were not long enough to reach his penis, so he had to curl up into the fetal position in order to masturbate for Archibald. *Id.* at ¶148.  Archibald took photographs while Poppel attempted to masturbate. *Id.* at ¶142–144.  Archibald then picked Poppel up, placed him on his left leg, and engaged in touching, fondling, and groping of Poppel's genitals. *Id.* at ¶¶151–153.  Over the course of five years, Poppel had "several appointments with Archibald at Rockefeller University Hospital. Several involved traumatic sexual abuse." *Id.* at ¶ 126.

As a result of this sexual abuse, Poppel suffered from a number of physical ailments, including severe headaches, irritable bowel syndrome, anxiety, and depression. *Id.* at ¶¶ 168, 177.  After he received the Letter from Rockefeller, Poppel suffered from anxiety, and the Letter "immediately brought Archibald's sexual abuse of Mr. Poppel to the forefront of his mind, and it forced Mr. Poppel to relive the encounter over, and over again." *Id.* at ¶¶ 185–186.

### C. **Plaintiff N.R.'s Individual Allegations**

Plaintiff N.R. was born slight in stature. *See* N.R. Complaint (Docket 19-CV-7609; ECF No. 7) at ¶110.  She had nine appointments with Archibald. *Id.* at ¶112.  He took her into a dimly lit examination room alone and locked the door behind them. *Id.* at ¶113.  Archibald then told N.R. to remove all of her clothing and stand against a wall with her palms facing upwards. *Id.* at ¶115.  He took nude photographs of N.R. standing against the wall. *Id.* at ¶117.  He also engaged in

5

"inappropriate touching," *id.* at ¶¶143, 151, 158, 187, 203, 218, 234, and made "physical, bodily contact with Plaintiff," *id.* at ¶159.

As a result of this sexual abuse, N.R. suffered from a number of physical ailments including amnesia, post-traumatic stress disorder, and digestive problems. *Id.* at ¶124, 127.  After N.R. received the Letter from Rockefeller, she suffered from anxiety and the "Letter immediately brought Archibald's sexual abuse of N.R. to the forefront of her mind, and it forced N.R. to relive the encounter over, and over again." *Id.* at ¶137.

D. **Procedural Background**

There are three pending, related cases before the Court: *Poppel v. Rockefeller University Hospital, et al.*, 19-CV-01403 (S.D.N.Y.); *N.R. v. Estate of Dr. Reginald Archibald et al.*, 19-CV-07609 (S.D.N.Y.); and *P.N. v. Rockefeller Institute et al.*, 19-CV-10493 (S.D.N.Y.).  The cases share operative facts, allegations, and claims.

New York's Child Victims Act ("CVA") extends the statute of limitations for survivors of child sexual abuse cases in New York for a one-year time window. N.Y. C.P.L.R. § 214-g.  Under the CVA, there are three types of sexual conduct that can serve as the predicate for revival of a claim: (1) any sexual offense as defined in New York Penal Law ("NYPL") Article 130; (2) incest (NYPL §§ 255.27, 255.26, or 255.25); or (3) the use of a child in a sexual performance (NYPL §263.05).  The statute was effective February 14, 2019, and the one-year time window began on August 14, 2019.  Poppel filed an amended complaint on August 19, 2019 and N.R. filed a complaint on August 15, 2019.  Both claims fall within the time-window specified in the CVA.

Poppel filed a Complaint on February 14, 2019. (Docket 19-CV-1403; ECF No. 7). Defendants filed a motion for a temporary stay on April 25, 2019. ECF Nos. 37–38.  Poppel opposed Defendants' motion on May 16, 2019. ECF No. 39.  Defendants replied on May 23, 2019.

ECF No. 40.  After careful consideration, the Court granted Defendants' motion to stay and the case was stayed until September 13, 2019. ECF No. 41.  Poppel filed an Amended Complaint on August 19, 2019. ECF No. 53 ("Poppel Compl.").  Defendants filed a motion to dismiss the claims on November 18, 2019. ECF Nos. 69–70.  Poppel opposed Defendants' motion on December 9, 2019. ECF No. 71.  Finally, Defendants replied on December 16, 2019. ECF No. 74.

N.R. filed a Complaint on August 15, 2019. (Docket 19-CV-7609; ECF No. 7) ("N.R. Compl.").  Defendants filed a motion to dismiss the claims on November 18, 2019. ECF No. 29. N.R. opposed Defendants' motion on December 9, 2019. ECF No. 31.  Finally, Defendants replied on December 16, 2019. ECF No. 34.[2]

## STANDARD OF REVIEW

When resolving a motion to dismiss under Fed. R. Civ. P 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).  Thus, "[t]o survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

---

[2] Defendants filed identical briefs in both dockets.  Poppel and N.R.'s briefs were largely similar, but differed slightly.  The Court lists the docket number of the appropriate case to distinguish between Poppel and N.R.'s briefing.

The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).   The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Moreover, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Id.* at 663.

## DISCUSSION

Plaintiffs bring fourteen claims against Defendant Rockefeller: (1) the individual torts of sexual abuse, assault, battery, fraud, and false imprisonment (Poppel Compl. Counts 1–5); (2) negligent hiring, supervision, and retention (Poppel Compl. Count 6; N.R. Compl. Count 7); (3) vicarious liability (Poppel Compl. Count 7; N.R. Compl. Count 8); (4) gross negligence and/or wanton and reckless misconduct (Poppel Compl. Count 8; N.R. Compl. Count 9); and (5) intentional and/or negligent infliction of emotional distress and intrusion upon seclusion (Poppel Compl. Counts 9–11; N.R. Compl. Count 10–12).[3]

Defendant Rockefeller moves to dismiss Counts 1–5, 7, and 9–11 of Poppel's Complaint in their entirety, Count 6 of Poppel's Complaint insofar as it asserts a claim for negligent hiring, and Counts 7–12 of N.R.'s Complaint in their entirety.

---

[3] N.R. alleges the intentional tort claims (N.R. Compl. Counts 1–5), as well as a claim for medical malpractice (N.R. Compl. Count 6), only against the Archibald Estate.  Additionally, Poppel's Complaint includes putative class claims for emotion distress and intrusion upon seclusion whereas N.R.'s Complaint only alleges these claims on behalf of herself.

## I.    Vicarious Liability Claims

Poppel brings claims against Rockefeller for vicarious liability based on Archibald's misconduct.  Specifically, Poppel alleges that Archibald was acting within the scope of his employment and that as a direct and proximate result of his misconduct, Poppel suffered pain of mind and body, shock, emotion distress, permanent disability, and a number of other injuries. *See* Poppel Compl. at ¶307.  Poppel asserts that Rockefeller should be held liable for sexual abuse, assault, battery, fraud, and false imprisonment based on Rockefeller's vicarious liability for Archibald's tortious acts.[4]

"Under the common law doctrine of respondeat superior, an employer may be held liable for the tortious acts of an employee committed within the scope of his employment." *Abdelhamid v. Altria Grp., Inc.*, 515 F. Supp. 2d 384, 394 (S.D.N.Y. 2007).  To state a claim for respondeat superior, "a plaintiff must plead facts showing, among other things, that the tortious conduct causing the injury was undertaken within the scope of the employee's duties to the employer and was thus in furtherance of the employer's interests." *Doe v. Alsaud*, 12 F. Supp. 3d 674, 677 (S.D.N.Y. 2014).  "An employee's actions fall within the scope of employment where the purpose in performing such actions is to further the employer's interest, or to carry out duties incumbent upon the employee in furthering the employer's business." *Guzman v. United States*, No. 11-CV-5834, 2013 WL 543343, at *9 (S.D.N.Y. Feb. 14, 2013) (quoting *Beauchamp v. City of New York*, 771 N.Y.S.2d 129 (2d Dep't 2004)).

---

[4] Count 7 of Poppel's Complaint and Count 8 of N.R.'s Complaint assert independent claims for vicarious liability against Rockefeller.  Although the theory of vicarious liability, and more specifically of respondeat superior, can be used to hold Rockefeller accountable for the intentional torts committed by Archibald, it is not an independent cause of action. *See, e.g.*, *Scott v. City of Mount Vernon*, No. 14-CV-4441, 2017 WL 1194490, at *25 (S.D.N.Y. Mar. 30, 2017) ("[R]espondeat superior is a theory of liability, not a freestanding cause of action.").  Accordingly, Count 7 of Poppel's Complaint and Count 8 of N.R.'s Complaint are dismissed.

The operative question for respondeat superior liability is whether Archibald was acting within the scope of his employment when he sexually abused Poppel. "New York courts have rejected *respondeat superior* claims . . . that a hospital was liable for its attendant's sexual assault on a patient." *Swarna v. Al-Awadi*, 622 F.3d 123, 144 (2d Cir. 2010) (citing *N.X. v. Cabrini Medical Cent.*, 97 N.Y.2d 247, 251 (2002)). This is because assault does not further a hospital's interest or business. *See Ross v. Mitsui Fudosan*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998) ("New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context."). There was not, nor could there be, a legitimate business or employment interest for Archibald's conduct. Indeed, Poppel acknowledges that Archibald was acting in a personal, not a professional, capacity during the alleged misconduct: "Archibald falsely represented to Plaintiff that it was medically necessary, and integral to effective treatment, for Plaintiff to submit to the sexual abuse perpetrated by Archibald, when, in reality, the sole purpose of the abuse was Archibald's own sexual gratification." Poppel Compl. at ¶147.

Citing several cases from outside of this jurisdiction, Poppel asserts that Archibald's sexual abuse was "inextricably intertwined and inseparable from" the medical treatment he provided. *See* Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Opp. Memo) (ECF No. 71) at 4–5 (citing *St. Paul Fire & Marine Ins. Co. v. Shernow*, 610 A.2d 1281, 1285 (Conn. 1992)). However, there are no binding cases on this Court that support this proposition. In fact, the New York Court of Appeals rejected a similar distinction in *Cabrini*. There, the Court noted that in *Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932 (1999), the employee "committed a sexual assault while engaged in his assigned duties," but that the Court of Appeals nevertheless concluded that "the employee departed from his duties for solely personal motives unrelated to the furtherance

of the Hospital's business." *Id.* at 933 (citation and quotation marks omitted).  Poppel also presents several policy reasons the Court should adopt an approach contrary to that set forth by New York state courts.  However, the "duty of a federal court sitting in diversity is to apply New York state law as defined and interpreted by New York state courts." *Vumbaca v. Terminal One Grp. Ass'n L.P.*, 859 F. Supp. 2d 343, 375 (E.D.N.Y. 2012).

Finally, Poppel asserts that this case falls into a class of "extremely unusual situations" in which New York law creates an exception to the "scope of employment" requirement for respondeat superior liability. *See* Opp. Memo at 10 (citing *Cornell v. State of New York*, 46 N.Y.2d 1032, 1033 (1979)).  Poppel relies on *Stone v. William M. Eisen Co.*, 219 N.Y. 205 (1916) to support this point.  In *Stone*, the defendant was treating plaintiff's feet for braces when she was feloniously assaulted. *Id.* at 208.  The *Stone* court found that when there is a "peculiar and special relationship[]" between plaintiff and defendant, for example the relationship between innkeeper and guest or between carrier and passenger, there is an exception to the "scope of employment" requirement for respondeat superior. *Id.* at 208–209.  This decision, however, was not the final say on this body of law.  Almost a century later, the New York Court of Appeals reversed course and noted that "[t]his sliding scale of duty is limited, however; it does not render a hospital an insurer of patient safety or require it to keep each patient under constant surveillance." *Cabrini*, 97 N.Y.2d at 253; *see also Judith M.*, 93 N.Y.2d at 933.  Indeed, New York courts have themselves set aside *Stone* in light of *Cabrini*. *See Doe v. Westfall Health Care Ctr., Inc.*, 303 A.D.2d 102, 112 (4th Dep't 1997) (rejecting plaintiff's argument about a special relationship based on the alleged sexual assault of a patient by a health care aide at a nursing home facility).

Archibald was not acting within the scope of his employment when he sexually assaulted Poppel and, accordingly, Rockefeller cannot be held vicariously liable for his intentional torts.

## II.     Negligent Hiring, Supervision, and Retention

Plaintiffs bring claims for negligent hiring, supervision, and retention against Rockefeller, who seeks to dismiss only the negligent hiring claims.

"In instances where [,as here,] an employer cannot be held vicariously liable for its employee's torts [because they occur outside the scope of his employment], the employer can still be held liable under theories of negligent hiring, negligent retention, and negligent supervision." *Bouchard v. New York Archdiocese*, 719 F. Supp. 2d 255, 260 (S.D.N.Y. 2010) (citing *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 654 N.Y.S.2d 791 (2d Dep't 1997)) (alteration in original). "A cause of action for negligent hiring or retention requires allegations that the employer . . . failed to investigate a prospective employee notwithstanding knowledge of facts that would lead a reasonably prudent person to investigate that prospective employee." *Richardson v. City of New York*, No. 04-CV-05314, 2006 WL 3771115, at *13 (S.D.N.Y. Dec. 21, 2006) (citation and quotation marks omitted).

Plaintiffs do not sufficiently allege a cause of action for negligent hiring. Plaintiffs do not allege facts regarding Archibald's propensity to commit sexual abuse before he was hired in 1940, nor do Plaintiffs allege knowledge of facts that would "lead a reasonably prudent person to investigate." *Richardson*, 2006 WL 3771115 at *13; *see also* Def Memo. at 11–12. Plaintiffs agree that "the allegations as to negligent hiring are currently thin" and request leave from the Court to "more fully state a claim for negligent hiring." Pl. Memo at 13. Plaintiffs believe leave is particularly appropriate here because (1) Rockefeller did not address negligent hiring in its pre-motion letter and (2) the state of public knowledge about what Rockefeller knew is rapidly evolving. *See id.* Federal Rule of Civil Procedure 15(a)(2) provides that "[t]he court should freely

give leave [to amend] when justice so requires." In light of this permissive standard, the Court

grants Plaintiffs leave to amend their complaints in regard to their negligent hiring claims.

### III.   Emotional Distress and Intrusion Upon Seclusion Claims

Finally, Plaintiffs bring claims for intentional infliction of emotional distress, negligent

infliction of emotional distress, and intrusion upon seclusion based on the Letter Rockefeller sent

to Archibald's former patients.[5]  Specifically, Plaintiffs allege that Rockefeller sent the Letter to

former patients of Archibald who "at the time they received the Letter, believed they had no legal

recourse" and for whom the Letter "reopen[ed] the wounds . . . of Archibald's sexual abuse."

Poppel Compl. at ¶¶ 321–22.  Plaintiffs also allege that Rockefeller had a "duty to avoid causing

the recipients of its Letter to suffer emotional distress and to avoid re-traumatizing victims of child

sexual abuse." *Id.* at ¶331.  Finally, Plaintiffs allege that Rockefeller intruded upon the "solitude,

seclusion, and private affairs and concerns of Plaintiff's by sending a letter to Plaintiff's private

quarters." *Id.* at ¶ 343–44.

### A.   Intentional Infliction of Emotional Distress.

Under New York law, a claim for intentional infliction of emotion distress requires "(1)

extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial

probability of causing, severe emotional distress; (3) a causal connection between the conduct and

the injury; and (4) severe emotional distress." *Conboy v. AT & T Corp.*, 241 F.3d 242, 258 (2d Cir.

2001) (citation omitted).  Plaintiffs must allege conduct that is "so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious,

and utterly intolerable in a civilized society." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999)

---

[5] As noted in footnote two, Poppel alleges these claims on behalf of a putative class whereas N.R. only alleges these claims on behalf of herself.

(quoting *Howell v. New York Post Co.*, 81 N.Y.2d 115, 122 (1993)).  This standard is "rigorous, and difficult to satisfy." *Howell*, 81 N.Y.2d at 122.

Rockefeller's Letter was sent to more than 1,000 former patients of Archibald, and stated four important pieces of information: (1) the recipient may have been a patient of Archibald; (2) based on "reports from several former patients regarding Dr. Archibald's interactions with them, we are reaching out to as many of his patients as we can locate;" (3) that Rockefeller hired Helen Cantwell of Debevoise & Plimpton LLP to assist with the outreach; and (4) that if "you have information you would like to share regarding your interactions with Dr. Archibald, please contact Helen." Poppel Compl. at ¶90.  Notably, the Letter does not reference any allegations against Archibald nor does it reference the nature of the reports from several former patients.  Moreover, the Letter does not imply that any particular recipient was a victim of Archibald's misconduct. Sending this Letter does not meet the high bar of "extreme and outrageous conduct."[6]  In this district, "[o]nly the most egregious conduct has been found sufficiently extreme and outrageous to establish this tort." *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 488 (S.D.N.Y. 2013) (collecting cases). The "highly disfavored cause of action" for IIED is "almost never successful," and this is not the rare case in which it is successful. *McGown v. City of New York*, No. 09-CV-8646, 2010 WL 3911458, at *5 (S.D.N.Y. Sept. 9, 2010).

Because Plaintiffs cannot establish the first element of the intentional infliction of emotion distress cause of action, this claim fails.

---

[6] Plaintiffs allege that Rockefeller sent the letter in order to "mitigate its liability" by collecting information from potential future litigants on the eve of the passage of the CVA. Poppel Compl. at ¶10.  Plaintiffs then argue that, because of this intent, Rockefeller's letter was extreme and outrageous.  The Court disagrees.  Plaintiffs conflate the conduct prong and the intent prong of the IIED test.  Even assuming that Rockefeller sent out the Letter for the purpose of mitigating its liability, the content and distribution of the Letter does not go "beyond all possible bounds of decency." *Stuto*, 164 F.3d at 827.

### B. **Negligent Infliction of Emotional Distress**

Under New York law, a claim for negligent infliction of emotional distress ("NIED") can proceed under one of two theories: (1) the "bystander" theory or (2) the "direct duty theory." *Werner v. Selene Fin., LLC*, No. 17-CV-06514, 2019 WL 1316465, at *11 (S.D.N.Y. Mar. 22, 2019) (citing *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996)).  The bystander theory applies if the defendant's negligence causes her to be threatened with serious physical harm and as a result she suffers emotion injury from witnessing the death or serious bodily injury of a member of her immediate family." *Id.* The direct duty theory applies when "she suffered an emotional injury from the defendant's breach of a duty which unreasonably endangered her own physical safety." *Id.*  New York courts also recognize NIED claims in "special circumstances" where there is "an especial likelihood of genuine and serious mental distress." *Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000) (citation omitted).[7]

Plaintiffs argue that the "special circumstances doctrine imposes a duty of care upon a hospital to avoid wrongly causing patients emotional distress."[8] Opp. Memo at 23.  New York

---

[7] The parties dispute whether, under New York law, demonstrating "extreme and outrageous conduct" is an element of an NIED claim.  New York state courts are split on the issue. *Compare Melendez v. City of New York*, 171 A.D.3d 566, 567 (1st Dep't 2019), *with Taggart v. Costabile*, 131 A.D.3d 243 (2d Dep't 2015).  Courts in this District are also split on this issue. *Compare Truman v. Brown*, No. 19-CV-1546, 2020 WL 353615, at *15 (S.D.N.Y. Jan. 21, 2020) (finding that "extreme and outrageous conduct" is an element of NIED claims), and *Black v. Ranley*, No. 17-CV-9026, 2018 WL 2766138, at *11 (S.D.N.Y. June 8, 2018) (same), with *Mortimer v. City of New York*, No. 15-CV-7186, 2018 WL 1605982, at *27 (S.D.N.Y. Mar. 29, 2018) ("A claim of negligent infliction of emotional distress ("NIED") does not require extreme or outrageous conduct"), and *Abdel–Karim v. EgyptAir Airlines*, 116 F.Supp.3d 389, 411 (S.D.N.Y. 2015) (same).  Since Rockefeller fails to state a claim for NIED under any of the theories of liability under New York State law, this Court declines to opine on the split of authority.

[8] Plaintiffs do not and could not allege NIED pursuant to either the bystander theory or the direct duty theory.  Rockefeller's conduct in sending the Letter to former patients of Archibald did not unreasonably endanger Plaintiffs' physical safety nor did it threaten them with physical harm.  Moreover, "the unreasonable endangerment element of a cause of action for negligent infliction of emotional distress involves an objective inquiry turning on whether a plaintiff's physical safety

courts have found "special circumstances" when, for example, a hospital negligently informs an individual about the death of a family member, *see Johnson v. State*, 37 N.Y.2d 378, 383 (1975), a patient is negligently diagnosed with a life-threatening injury, *see Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000), or a hospital denies access to the remains of a deceased family member, *see Lando v. State of New York*, 39 N.Y.2d 803, 804–05 (1976); *see also Vumbaca v. Terminal One Grp. Ass'n L.P.*, 859 F. Supp. 2d 343, 376 (E.D.N.Y. 2012) ("Special circumstances exist where the claim involves the death of a family member . . . or diagnosis of a life-threatening disease."). Special circumstances have not been found for "emotion harm resulting from diagnosis that falls short of life-threatening disease," *id.* (citing *Lancellotti v. Howard*, 155 A.D.2d 588, 589 (1989), or for "learning that your spouse was terminated by an employer." *Dollman v. Mast Indus., Inc.*, 731 F. Supp. 2d 328, 341 (S.D.N.Y. 2010).

Rockefeller's Letter did not "obviously [have] the propensity to cause extreme emotional distress." *Mortimer v. City of New York*, No 15-CV-7186, 2018 WL 1605982, at *27 (S.D.N.Y Mar. 29, 2018). The Letter—which was sent to over 1,000 of Archibald's former patients and did not reference the nature of the allegations against him—is not analogous to any of the circumstances in which New York courts have found that special circumstances apply. *See, e.g.*, *Carney v. Bos. Mkt.*, No. 18-CV-0713, 2018 WL 6698444, at *4 (S.D.N.Y. Dec. 20, 2018) ("[T]he facts of this case are not akin to the 'special circumstances' cases, which involve misinforming a plaintiff of the death of a loved one, falsely informing a plaintiff of a serious medical diagnosis

---

actually was endangered, not a subjective evaluation dependent on the plaintiff's state of mind." Though New York law does not require a physical injury, Plaintiffs allege no facts to support a conclusion that Rockefeller's conduct in mailing them the Letter threatened their physical safety. *See Torain v. Casey*, No. 16-CV-2682, 2016 WL 6780078 at *6 (S.D.N.Y. Sept. 16, 2016) ("[Plaintiff] has not alleged facts from which it would be possible to conclude that he was in immediate physical danger.").

and other instances of comparable gravitas not present in this case.").  Moreover, "New York courts have expressed a 'longstanding reluctance to recognize causes of action for negligent infliction of emotional distress, especially in cases where the plaintiff suffered no independent physical or economic injury.'" *Corley v. Vance*, 365 F. Supp. 3d 407, 454 (S.D.N.Y. 2019) (citing *Colo. Capital Invs., Inc. v. Owens*, 304 F. App'x 906, 908 (2d Cir. 2008)).  Though Plaintiffs allege that they suffered serious and troubling re-traumatization when they received the Letter from Rockefeller, Rockefeller's conduct in sending the Letter was not itself particularly heinous. *See Samtani v. Cherukuri*, No. 11-CV-02159, 2015 WL 64671, at *15 (E.D.N.Y. Jan. 5, 2015) (citing *Johnson*, 37 N.Y.2d at 382) ("[I]n these cases—given the particularly heinous nature of the conduct—courts presume 'an especial likelihood of genuine and serious mental distress . . ., which serves as a guarantee that the claim is not spurious.'").  Indeed, in response to the Letter, over 900 individuals reached out to share information about either their experiences or the experiences of others.  While it is unfortunate that some Plaintiffs were re-traumatized by the Letter, Rockefeller's conduct does not give rise to a "special circumstance" under New York law.

### C.  Intrusion Upon Seclusion

"New York has consistently refused to recognize a common law right of privacy, and hence there is no cause of action of intrusion upon seclusion under New York law." *Hamlett v. Santander Consumer USA Inc.*, 931 F. Supp. 2d 451, 457 (E.D.N.Y. 2013).  The Parties dispute whether New York law applies to this case.[9]  New York's choice of law analysis for tort claims requires an "interest analysis" to determine the applicable law. *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir. 2006) (quoting *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 196 (1985)).  Pursuant to this analysis, the "law of the jurisdiction having the greatest

---

[9] Poppel argues that Florida law applies and N.R. argues that Massachusetts law applies.

interest in the litigation will be applied." *Id.* (citation and quotation marks omitted). "Under the interest-analysis test, torts are divided into two types, conduct-regulating rules, such as 'rules of the road,' and loss-allocating rules, 'such as those limiting damages in wrongful death actions, vicarious liability rules, or immunities from suit.'" *In re Thelen LLP*, 736 F.3d 213, 220 (2d Cir. 2013).

The Court concludes, and the Parties agree, that there is an "actual conflict of laws" between New York law—which does not recognize the tort of intrusion upon seclusion—and Florida and Massachusetts laws—which in some, limited circumstances recognize that tort. *See Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). The Parties also agree that the alleged tort in this case is a conduct regulating rule. The alleged tortious conduct occurred in New York, but the injury was suffered in the states in which Plaintiffs received the Letter from Rockefeller. Plaintiffs assert that, because the injury occurred in Florida and Massachusetts, the laws of those states apply. Defendants, on the other hand, assert that the law of the place of the tort—i.e., New York—applies.

"If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *GlobalNet*, 449 F.3d at 384 (quoting *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993)); *see also Schultz*, 65 N.Y.2d at 198 ("[W]hen the conflicting rules involve the appropriate standards of conduct, rules of the road, for example, the law of the place of the tort will usually have a predominant, if not exclusive, concern."). Though the alleged injury was felt in states across the country, the Parties acknowledge that the alleged tortious conduct occurred in New York.[10] Given that, "the place of the allegedly wrongful conduct [] generally has

---

[10] Plaintiffs cite *Schultz* for the proposition that for multi-state torts, "the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred." *Schultz*, 65 N.Y.2d at 195. However, as the Second Circuit noted in *Licci*, this language from

superior 'interest in protecting the reasonable expectations of the parties who relied on [the laws of that place] to govern their primary conduct and in the admonitory effect that applying its laws will have on similar conduct in the future,'" New York law applies. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 51 (2d Cir. 2013) (citing *Schultz*, 65 N.Y.2d at 198).  Since New York law does not have a cause of action for intrusion upon seclusion, Plaintiffs' intrusion upon seclusions claim is dismissed.

## IV.    N.R.'s Claims

Finally, Rockefeller alleges that N.R.'s claims are not covered by the CVA because she does not allege facts that establish the elements of any of the underlying predicate crimes for invocation of the CVA.

N.R.'s allegations sufficiently allege, at this stage of the litigation, that Archibald committed a predicate crime for invocation of the CVA.  Specifically, N.R. alleges that she experienced "traumatic sexual abuse" during at least nine appointments with Archibald, which included him taking nude photographs of N.R. standing against a wall. *See* Compl. at ¶¶ 112–116. Given the detailed allegations of Archibald taking "sexually explicit photographs of his patients," including "close-up photographs of his victims' genitals," N.R.'s allegations that Archibald took sexually explicit pictures of her are plausible and sufficiently allege a violation of NYPL §263.05.

NYPL §263.05 criminalizes "a sexual performance if knowing the character and content thereof [the defendant] employs, authorizes or induces a child less than seventeen years of age to engage in a sexual performance." NYPL §263.05.  The term "sexual performance" means any performance that includes "sexual conduct" by a child less than seventeen years of age. *See* NYPL

---

*Schultz* related to a loss-allocation doctrine rather than a conduct regulating rule. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 50 (2d Cir. 2013).

§263.00(1).  The term "performance" includes photographs and the term "sexual conduct" includes "lewd exhibition of the genitals." *See* §§ 263.00(1), (3).  New York courts use a six-factor test to determine whether an exhibition is "lewd:"  "(1) whether the focal point of the visual depiction is on the child's genitalia or pubic area; (2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or a pose generally associated with sexual activity; (3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child; (4) whether the child is fully or partially clothed, or nude; (5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; [and] (6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer." *Figueroa v. Mazza*, 825 F.3d 89, 101 (2d Cir. 2016) (citing *People v. Horner*, 752 N.Y.S.2d 147, 149–50 (3d Dep't 2002)).[11] Liberally constructing N.R.'s Complaint, she alleges that Archibald instructed her to remove all of her clothing, directed her to stand against a wall with her arms out and palms facing upwards, and took sexually explicit photographs of her while she was nude, for the sole purpose of his own sexual gratification, all while she was between the ages of 7 and 15 years old. *See* Compl. at ¶¶ 115–117.  Many of the six factors support finding that the photographs Archibald took were indeed "lewd" and violated §263.05.  Drawing all reasonable inferences in N.R.'s favor, her Complaint plausibly alleges a violation of NYPL §263.05.[12]

---

[11] The Second Circuit has noted that, in some cases, these six factors may be "underinclusive." *United States v. Spoor*, 904 F.3d 141, 150 (2d Cir. 2018).  This may be especially true in this case, where the circumstances surrounding the photographs—i.e., Archibald took N.R. to a dimly lit, locked examination room—and his pattern of misconduct may further support liability under §206.05.  Nevertheless, at this stage of the litigation, Plaintiff need only plausibly allege a violation of NYPL, which she has done here.

[12] N.R. also alleges that Archibald's conduct constitutes Forcible Touching under NYPL § 130.52 and Sexual Abuse in the First Degree under NYPL §130.65.  Specifically, N.R. alleges that Archibald engaged in "inappropriate touching" and "physical conduct." *See, e.g.*, Compl. at ¶¶ 151–52.  Given that Plaintiff sufficiently pled a predicate offense to invoke the CVA, the Court

## CONCLUSION

For the reasons set forth above, Defendant Rockefeller's motion to dismiss is **GRANTED** in part and **DENIED** in part.  The Court dismisses Counts 1–5, 7, and Courts 9–11 of Poppel's Complaint; and Counts 8 and 10–12 of N.R.'s Complaint.  Plaintiffs are **GRANTED** leave to amend their complaints in accordance with this Opinion.  Plaintiffs should file amended complaints within 30 days of the filing of this Opinion.

**SO ORDERED.**

Dated:      May 27, 2020
            New York, New York

_____
            **ANDREW L. CARTER, JR.**
            **United States District Judge**

---

declines to opine on whether N.R. also pled additional sexual offenses.  All that is required to invoke the CVA is allegations of one of the relevant predicate crimes. *See* CPLR §214-g.